1  XAVIER BECERRA
   Attorney General of California
2  ROBERT W. BYRNE
   MICHAEL L. NEWMAN
3  Senior Assistant Attorneys General
   MICHAEL P. CAYABAN
4  CHRISTINE CHUANG
   EDWARD H. OCHOA
5  Supervising Deputy Attorneys General
   BRIAN J. BILFORD
6  SPARSH S. KHANDESHI
   HEATHER C. LESLIE
7  JANELLE M. SMITH
   JAMES F. ZAHRADKA II
8  LEE I. SHERMAN (SBN 272271)
   Deputy Attorneys General
9    300 S. Spring Street, Suite 1702
     Los Angeles, CA 90013
10   Telephone: (213) 269-6404
   E-mail: Lee.Sherman@doj.ca.gov
11 *Attorneys for Plaintiff State of California*

12                    IN THE UNITED STATES DISTRICT COURT

13                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                              OAKLAND DIVISION

15

16

17 **STATE OF CALIFORNIA; STATE OF**        Case No. _____
   **COLORADO; STATE OF**
18 **CONNECTICUT; STATE OF HAWAII;**
   **STATE OF ILLINOIS; STATE OF**
19 **MAINE; STATE OF MARYLAND;**            **COMPLAINT FOR DECLARATORY**
   **COMMONWEALTH OF**                      **AND INJUNCTIVE RELIEF**
20 **MASSACHUSETTS; ATTORNEY**
   **GENERAL DANA NESSEL ON BEHALF**
21 **OF THE PEOPLE OF MICHIGAN;**
   **STATE OF MINNESOTA; STATE OF**
22 **NEVADA; STATE OF NEW JERSEY;**
   **STATE OF NEW MEXICO; STATE OF**
23 **NEW YORK; STATE OF OREGON;**
   **STATE OF RHODE ISLAND; STATE OF**
24 **VERMONT; COMMONWEALTH OF**
   **VIRGINIA; and STATE OF WISCONSIN;**
25
                                            Plaintiffs,
26
              **v.**
27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DONALD J. TRUMP,** in his official capacity as President of the United States of America; **UNITED STATES OF AMERICA; U.S. DEPARTMENT OF DEFENSE; MARK T. ESPER**, in his official capacity as Secretary of Defense; **RYAN D. MCCARTHY**, in his official capacity as Secretary of the Army; **THOMAS B. MODLY**, in his official capacity as Acting Secretary of the Navy; **BARBARA M. BARRETT**, in her official capacity as Secretary of the Air Force; **U.S. DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT,** in his official capacity as  Secretary of the Interior; **U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF**, in his official capacity as Acting Secretary of Homeland Security;

                                            Defendants.

**INTRODUCTION**

1.      The States of California, Colorado, Connecticut, Hawaii, Illinois, Maine, Maryland, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, Wisconsin, the Commonwealths of Massachusetts and Virginia, and Attorney General Dana Nessel on behalf of the People of Michigan (collectively, "Plaintiff States") bring this action to protect their residents, National Guard units, natural resources, and sovereign and economic interests from the harm caused by President Donald J. Trump's flagrant disregard of fundamental separation of powers principles engrained in the United States Constitution.  For the second consecutive year, the Trump Administration has acted contrary to the will of Congress by redirecting billions of dollars appropriated by Congress for Department of Defense ("DOD") projects toward building a wall on the United States-Mexico border.  This includes the diversion of funds for military projects in the Plaintiff States and vital equipment for the States' respective National Guards.  Defendants must be enjoined from carrying out President Trump's unconstitutional and unlawful scheme.

2.      For years, President Trump has stated his intention to build a wall across the United States-Mexico border.  Congress has repeatedly rebuffed the President's insistence to fund a border wall, including during a record 35-day partial government shutdown over the border wall dispute in fiscal year ("FY") 2019.[1]  After the government reopened, Congress approved, and the President signed into law, a limited $1.375 billion appropriation for fencing, but Congress made clear that funding could not be used to build President Trump's proposed border wall.  On February 15, 2019, the very same day President Trump signed the negotiated spending bill into law, he announced an executive action ("2019 Executive Action") to redirect $6.7 billion that Congress had appropriated for other purposes towards construction of the border wall, including through the declaration of a national emergency under the National Emergencies Act ("Emergency Declaration").

_____

[1] References to "border wall" in this Complaint refer to any barrier or border-related infrastructure and/or project relating to the construction of a barrier or border-related infrastructure along the southern border that President Trump has called for and has not been approved by Congress.

3.      Despite this prior $6.7 billion diversion, the Administration asked Congress to appropriate billions of dollars more toward a border wall in FY 2020.  Once again, Congress declined to do so, only appropriating $1.375 billion in funding for fencing on the border.  After signing this appropriation into law, on February 13, 2020, the Administration announced, using statutory authority corresponding to that which it relied upon the previous fiscal year, that it would redirect over $3.8 billion in funds that Congress appropriated to the DOD for other purposes toward construction of a border wall ("2020 Executive Action," with the Emergency Declaration, the "Executive Actions").  Reports also indicate that the Administration is planning on diverting $3.7 billion additional funds from military construction projects under 10 U.S.C. § 2808 toward construction of a border wall in FY 2020.

4.      Use of these additional federal funds for the construction of a border wall is contrary to Congress's intent and in violation of the U.S. Constitution, including separation of powers principles, the Presentment Clause, and the Appropriations Clause.  This use would divert funding that has been appropriated to support the active military, the states' National Guard units, and other DOD projects in Plaintiff States, including, on information and belief, military construction projects, for the non-appropriated purpose of constructing a border wall.  Defendants further do not satisfy the criteria in the statutes that they invoke to enable them to redirect funds toward the construction of a border wall.  In addition, DOD's actions to divert funds from appropriated DOD projects toward a border wall for which funding has not been appropriated by Congress is arbitrary and capricious and exceeds DOD's authority in violation of the Administrative Procedure Act ("APA").

5.      The redirection of funds from authorized DOD projects located in Plaintiff States will cause damage to their economies, harming their proprietary interests.  Further, Defendants' diversion of funds that Congress appropriated to allow the Plaintiff States' National Guard units to procure military equipment will also harm the States.  And the diversion of any funding toward construction of a wall along California's and New Mexico's southern borders will irreparably harm the sovereign interests of those States due to the environmental damage to their natural resources that construction will cause.

6.      A court in this District determined that Defendants acted unlawfully by diverting billions of dollars in federal funds toward the construction of border barriers in FY 2019.  There is no reason to find any differently for Defendants' FY 2020 diversion of federal funds. Defendants are relying on the same or equivalent statutory authority that they did last year, and Defendants continue to act in the face of clear congressional disapproval of the use of billions of dollars for a border wall.  For these reasons, and those discussed below, the Court should declare that the Executive Actions directing the diversion of federal funds and other resources for border wall construction are unlawful and unconstitutional, and enjoin Defendants from taking any action in furtherance of the Executive Actions.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction because this action arises under the Constitution and laws of the United States.  Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. §§ 701-06.  This Court also has jurisdiction under 28 U.S.C. §§ 1331 and 2201.

8.      An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202.

9.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the California Attorney General and the State of California have offices at 455 Golden Gate Avenue, San Francisco, California and at 1515 Clay Street, Oakland, California, and therefore reside in this district, and no real property is involved in this action.  This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

10.     Assignment to the Oakland Division of this District is proper pursuant to Civil Local Rules 3-2(c)-(d) and 3-5(b) because Plaintiff State of California and Defendant United States both maintain offices in the District in Oakland.

**PARTIES**

**PLAINTIFF STATE OF CALIFORNIA**

11.     The State of California, represented by and through its Attorney General, is a sovereign state of the United States of America.

3

12.     Attorney General Xavier Becerra is the chief law officer of the State of California and head of the California Department of Justice, and has the authority to file civil actions to protect California's rights and interests, the environment, and the natural resources of this State. Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11, 12600-12; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 761-62 (1934) (The Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests."). This challenge is brought pursuant to the Attorney General's independent constitutional, common law, and statutory authority.

13.     Governor Gavin Newsom is the chief executive officer of the State of California. The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed. As the leader of the executive branch, the Governor is the chief of California's executive branch agencies, including those whose injuries are discussed in this Complaint. Cal. Const., art. V, § 1. Governor Newsom is the Commander-in-Chief of the California National Guard. Cal. Const., art. V, § 7; Cal. Mil. & Vet. Code §§ 550-67.

14.     California, as one of several affected states located within President Trump's declared "national emergency" southern border area, has an interest in ensuring public safety within its borders and protecting its economic interests and the rights of its residents. California shares over 140 miles of its southern border with Mexico. The orderly flow of goods and people across the border is a critical element in California's success as the fifth-largest economy in the world.

15.     California has an interest in protecting the economic health and well-being of its residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

16.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by Defendants' reduction of federal defense spending in California due to diversion of funding to the border wall.

17.     More defense contractor funding is spent in California than in any other state, and such funding generates significant state and local tax revenues, employment, and economic activity. California has an interest in preventing the diminution of specific tax revenues caused

4

by reduced procurement of military equipment and corresponding reduction in economic activity. *Wyoming v. Oklahoma*, 502 U.S. 437, 448-50 (1992).

18.     Defendants' diversion of funds from DOD projects, including, on information and belief, the diversion of funds from the over $4 billion of military construction projects anticipated in California, will harm California's economy.

19.     The diversion of DOD funding for projects supporting or used by California's National Guard units harms the State.  The California National Guard has over 13,000 soldiers, almost 5,000 air members, employs more than 4,700 people on a full-time basis, and operates 126 facilities in the State.  The California National Guard receives more than 77 percent of its funding from the federal government.  The purpose of the California National Guard includes providing emergency public safety support to civil authorities as directed by the Governor.

20.     On information and belief, California is injured by the loss of funds available for equipment to its National Guard.  DOD's reprogramming action diverts $790 million from an account used to provide equipment for the states' National Guard units and $100 million from an account for modernization of HMMWV vehicles ("Humvees") specifically for the states' National Guard units.  *California v. Trump*, No. 4:19-cv-00872-HSG (N.D. Cal., filed Feb. 18, 2019) (*California*), ECF No. 271-1, Ex. C at 2, 5.  This diversion diminishes California's opportunity to seek equipment that the California National Guard would use to provide public safety support to civil authorities in times of emergency such as natural disasters, and to provide mission-ready forces to the federal government.

21.     California has an interest in its exercise of sovereign power over individuals and entities within the State, including enforcement of its legal code.  *Snapp*, 458 U.S. at 601; *Hawaii v. Trump*, 859 F.3d 741, 765 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018). California also has a sovereign interest in the natural resources of this State—such as wildlife, fish, and water—that are held in trust by the State for its residents and are protected by state and federal laws.  *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1178 (9th Cir. 2011).

22.     Defendants' diversion of funding and resources to construct a wall along the southern border will create environmental harm and deprive California of its right to protect its public trust resources.

23.     Specifically, in the areas of California's borderlands where construction of a border wall will take place, dozens of sensitive plant and animal species that are listed as "endangered," "threatened," or "rare" will be seriously at risk from the construction and operation of the border wall.

24.     Defendants' unlawful and unconstitutional actions undermine California's sovereignty and harm the State through their effects on California residents, businesses, and the environment.

### PLAINTIFF STATE OF COLORADO

25.     The State of Colorado is a sovereign state of the United States of America.

26.     The State of Colorado brings this action by and through its Attorney General, Philip J. Weiser.  The Attorney General has authority to represent the State, its departments, and its agencies, and "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party."  Colo. Rev. Stat. § 24-31-101.

27.     The State of Colorado will suffer injury because of the actions of Defendants and has standing to bring this action.

28.     Colorado would be harmed by the loss of funding for military construction projects in the State.  Colorado has many large military bases, including North American Aerospace Defense Command, Peterson Air Force Base, Schriever Air Force Base, Buckley Air Force Base, the Air Force Academy, and Fort Carson.  Construction at these bases has significant economic impact on the surrounding communities and the State itself.

29.     Colorado is harmed by the loss of defense spending in the State.  Over 60,000 people work for the Department of Defense in Colorado and pay taxes in our State.  Defense spending also goes to contracts with Colorado companies and companies that employ Coloradans, all of which have in impact in surrounding communities and the State.  In addition, Colorado

1  receives a much higher proportion of defense spending than other states of similar population, so

2  reduction in defense spending disproportionately harms Colorado.

3      30.    Colorado is further injured by the possible loss of equipment to its National Guard

4  units.  Colorado's National Guard has over 5,500 members who collectively have an economic

5  impact of more than $240 million.  The loss of equipment to this National Guard will reduce its

6  effectiveness in meeting its mission of protecting life and property and preserving peace, order

7  and public safety.  In the past, the Colorado National Guard has intervened in cases of blizzards,

8  floods, and fires in Colorado, preventing additional harm to Colorado's residents and economy in

9  times of crisis.  Without the proper equipment, Colorado's National Guard cannot provide the

10  same level of protection to Colorado's residents and economy when its services are most needed.

11                        **PLAINTIFF STATE OF CONNECTICUT**

12      31.    The State of Connecticut, represented by and through its Attorney General, is a

13  sovereign state of the United States of America.

14      32.    Attorney General William Tong is the chief legal officer of the State of

15  Connecticut and has the authority to file civil actions to protect Connecticut's rights and interests.

16  Conn. Const., art. IV, § 4; Conn. Gen. Stat. §§ 3-125.  This challenge is brought pursuant to the

17  Attorney General's authority and responsibility to protect Connecticut's sovereign, quasi-

18  sovereign, and proprietary interests.

19      33.    Governor Ned Lamont is the chief executive officer of the State.  The Governor is

20  responsible for overseeing the operations of the State and ensuring that its laws are faithfully

21  executed.  As the leader of the executive branch, the Governor is the chief of Connecticut's

22  executive branch agencies, including those whose injuries are discussed in this Complaint.  Conn.

23  Const. art IV, § 5.

24      34.    On information and belief, Connecticut is aggrieved by the actions of Defendants

25  and has standing to bring this action because of the injury caused by Defendants' unlawful and

26  unconstitutional diversion of funding from National Guard procurement accounts, military

27  hardware projects, and military construction projects in Connecticut toward the construction of a

28  border wall in Texas, Arizona, New Mexico, and California.  Defendants' actions will hurt

Connecticut's economy, reduce state tax revenues, damage the State's critical security infrastructure, impair National Guard readiness, and threaten the safety of Connecticut's National Guard and of all Connecticut residents.

35.     Defense spending in Connecticut is critical not just to national military readiness but to Connecticut's economy.  The Administration's planned funding diversions threaten to harm the State's economy, employment, and tax revenues.  As of 2017, annual defense spending injected $15 billion into Connecticut's economy, accounting for 5.6 percent of the State's per capita GDP – a higher percentage than in all but two other states.[2]

36.     DOD's reprogramming action diverts funding away from critical military projects for which Connecticut-based companies produce key components.  To cite just one prominent instance: the reprogramming slashes both the Navy's JSF-STOVL and the Air Force's F-35 combat aircraft – variants on the world's most advanced Fifth Generation fighter jets – which are powered by the F-135 engine manufactured by Connecticut defense contractor Pratt & Whitney.[3] *California*, ECF No. 271-1, Ex. C at 2-3.  Each highly-specialized jet engine costs almost $20 million, which is injected directly into Connecticut's economy.  The aircraft engine funding supports not just Pratt's thousands of Connecticut-based employees but also the employees of the 92 Connecticut-based companies in Pratt's supply chain.[4]  Each of those employees, and the company itself, pays state taxes, and Connecticut has a powerful interest in preventing the diminution of specific tax revenues caused by reduced procurement of military equipment and corresponding reduction in economic activity.  *See Wyoming*, 502 U.S. at 448-50.

37.     Connecticut is further injured by the threatened loss of equipment for its National Guard in at least three ways that all implicate force readiness and the ability of the Connecticut

---

[2] U.S. Dep't of Def., Off. of Econ. Adjustment, *Defense Spending by State: Fiscal Year 2017* 4 (Mar. 2019), https://tinyurl.com/yxwo5k2m (FY 2017 DOD Defense Spending by State)
[3] Pratt & Whitney, *F135 Engine*, https://www.pw.utc.com/products-and-services/products/military-engines/f135.
[4] Conn. Bus. and Industry Ass'n, *What Keeps Pratt's Leduc Up at Night?* (May 1, 2019), https://www.cbia.com/news/economy/pratt-leduc-aerospace-workforce/.

National Guard to protect the safety and health of Connecticut residents in the face of natural disasters and other domestic emergencies.[5]

    a.  First: to be ready to serve, the Connecticut Army National Guard requires an additional forty-seven Humvees.  The Administration's attempt to slash $100 million in Humvee modernization funds, *California*, ECF No. 271-1, Ex. C at 2, threatens Connecticut's ability to modernize and replace this critical missing equipment.

    b.  Second: the reprogramming of funds for C-130J aircraft, *id.*, ECF No. 271-1, Ex. C at 3, threatens significant harm to the readiness of Connecticut's Air National Guard.  The 103rd Aircraft Wing, based at Connecticut's Bradley Air National Guard Base in East Granby, now operates legacy C-130H aircraft. The 103rd Aircraft Wing has asked to convert to the C-130J and Connecticut has executed over $60 million in military construction funding over the last six years to upgrade Bradley in expectation of making a C-130J conversion.  The value of that investment plummets if Connecticut is denied the opportunity to upgrade.

    c.  Third: Connecticut's Army National Guard has requested $8.79 million for FY 2020 in equipment from the National Guard and Reserve Equipment Account, from which Defendants seek to divert funding.  That equipment, which is essential for force readiness, includes medium tactical vehicles (MTVs), light medium tactical vehicles (LMTVs), and trailers that are needed for transporting troops and materiel.

38.    Military construction fund diversion also poses a significant economic threat to Connecticut.  On information and belief, in FY 2020, Connecticut stands to lose as much as $72 million in military construction funding that would otherwise be injected into the State's economy.  Those funds are authorized for building a new pier at Connecticut's Submarine Base

---

[5] Letter from Francis J. Evon, Jr., Adjutant General of the Connecticut National Guard, to Chris Murphy, U.S. Senator from Connecticut (Feb. 25, 2020) (on file with counsel).

New London, the Navy's primary East Coast submarine base.  The funding would directly feed into Connecticut's economy, since many Connecticut-based contractors would work on the pier.  But neglect of the pier and the base is a more existential threat to the region.  In addition to its critical role in projecting United States naval power around the world, Submarine Base New London is a population and economic hub for eastern Connecticut, with housing and support facilities for more than 21,000 civilian workers, service members, and their families.  In the absence of the military construction funding, the base will be forced to fall back on inadequate and structurally-deteriorated piers that do not meet current standards for the Los Angeles- and Virginia-class submarines that have made their homeport in New London.  The deterioration of the base, and potential loss of opportunities to serve as a homeport for submarines, could mean loss of population and jobs across eastern Connecticut, a shrunken regional economy, and diminished state revenues.

## PLAINTIFF STATE OF HAWAII

39.     The State of Hawaii, represented by and through its Attorney General, is a sovereign state of the United States of America.

40.     Attorney General Clare E. Connors is the chief legal officer of the State of Hawaii and has authority to appear, personally or by deputy, for the State of Hawaii in all courts, criminal or civil, in which the State may be a party or be interested.  Haw. Rev. Stat. § 28-1.  The Department of the Attorney General has the authority to represent the State in all civil actions in which the State is a party.  *Id.* § 26-7.  This challenge is brought pursuant to the Attorney General's constitutional, statutory, and common law authority.  *See* Haw. Const. art. V, § 6; Haw. Rev. Stat. Chapter 28; Haw. Rev. Stat. § 26-7.

41.     On information and belief, Hawaii is aggrieved by the actions of Defendants, including Defendants' diversion of funds, and has standing to bring this action because of the injury to the State and its residents caused by the reduction of federal defense spending in Hawaii.

42.     Hawaii has an interest in protecting its economy and the economic health and well-being of its residents.

43.     Diversion of funding from DOD projects in Hawaii will harm the State and its

10

residents by injuring Hawaii's economy.  Defense spending, which includes military construction projects, is the second-largest segment of Hawaii's economy and, as of 2017, represents 7.3 percent of the State's Gross Domestic Product—the second highest percentage in the nation.[6] Hawaii has several major military installations, including Joint Base Pearl Harbor-Hickam, Schofield Barracks, Fort Shafter, Marine Corps Base Hawaii (Kaneohe Bay), Camp Smith, Tripler Army Medical Center, Wheeler Army Airfield, and the Pacific Missile Range Facility at Barking Sands.

44.    Defense spending in Hawaii contributes to economic activity, employment, and increased tax revenues, all of which would be harmed if that funding is diverted, thereby injuring the State of Hawaii.  As of 2017, annual defense spending injects $6.5 billion into Hawaii's economy, is responsible for 64,366 jobs, and accounts for $4.7 billion in total payroll (and the associated income tax revenue).[7]

45.    On information and belief, hundreds of millions of dollars have been appropriated for military construction projects in Hawaii, and those funds are threatened by possible diversion. For FY 2020, Hawaii stands to lose as much as approximately $316 million in military construction funding.  Those funds are authorized for a command and control facility at Fort Shafter, bachelor enlisted quarters at Kaneohe Bay, magazine consolidation at the West Loch naval magazine, and a Special Operations Forces undersea operational training facility at Joint Base Pearl Harbor-Hickam.

## PLAINTIFF STATE OF ILLINOIS

46.    The State of Illinois is a sovereign state of the United States of America.

47.    This action is being brought on behalf of the State by Attorney General Kwame Raoul, the State's chief legal officer.  *See* Ill. Const., Art. 5, § 15; 15 Ill. Comp. Stat. 205/4.

48.    J. B. Pritzker is the governor of Illinois, and under Illinois law has the "supreme executive power" and the duty to ensure "the faithful execution of the laws."  Ill. Const., Art. V, § 8.

---

[6] *FY 2017 DOD Defense Spending by State*, *supra* note 2, at 4.
[7] *Id.* at 39.

49.     On information and belief, Illinois is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the diversion of federal funding from military construction projects in Illinois and equipment for the Illinois National Guard to the construction of a border wall on the nation's southern border.

50.     As of 2017, Illinois was the location for nearly $8 billion in federal defense spending.[8]  Diverting military construction funds could deprive Illinois of over $110 million in already approved federal funding for military construction projects.  Congress has already appropriated $5 million for an automated record fire range that will serve the Army National Guard in Marseilles, Illinois, as well as $9 million to construct a new fire crash/rescue station at the Greater Peoria Regional Airport.  For FY 2020, Congress has appropriated $100 million for a new joint operations and mission planning center at Scott Air Force Base in St. Clair County, Illinois.  Scott AFB is home to the Eighteenth Air Force as well as the Air Force's Air Mobility Command and the United States Transportation Command.

51.     Illinois is further injured by the prospect of losing needed equipment for its Air National Guard.  In particular, the DOD's reprogramming action specifies that DOD will divert $196 million intended for purchase of C-130J airlift aircraft.  *California*, ECF No. 271-1, Ex. C at 3.  A bipartisan coalition of U.S. representatives in Illinois had already requested new-generation C-130J aircraft to support the Illinois Air National Guard's 182nd Airlift Wing stationed in Peoria, Illinois—a unit that has not acquired new aircraft since 2005.[9]  The diversion of funds decreases the chances that the unit in Peoria will successfully obtain the planes needed to modernize its exceptionally busy fleet.[10]

52.     In filing this action, the Attorney General seeks to protect the residents and agencies of Illinois from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to Illinois by Defendants' actions.  Those injuries include harm to Illinois's sovereign, quasi-sovereign, and proprietary interests.

---

[8] *FY 2017 DOD Defense Spending by State*, *supra* note 2, at 42–43.
[9] *See* Andy Kravetz, *Lawmakers Seek New Planes for 182nd Airlift Wing*, PEORIA J.-STAR (Dec. 15, 2019), https://tinyurl.com/rybaxch.
[10] *See* Letter from Sen. Richard J. Durbin, Sen. Tammy Duckworth, & Rep. Cheri Bustos to Mark Esper, Sec. of Defense (Feb. 27, 2020), https://tinyurl.com/tz4ezm5.

12

**PLAINTIFF STATE OF MAINE**

53.     The State of Maine, represented by and through its Attorney General, is a sovereign state of United States of America.

54.     The Attorney General of Maine, Aaron M. Frey, is a constitutional officer with the authority to represent the State of Maine in all matters, and serves as its chief legal officer with general charge, supervision, and direction of the State's legal business.  Me. Const. art. IX, § 11; 5 M.R.S. §§ 191 et seq.  The Attorney General's powers and duties include acting on behalf of the State and the people of Maine in the federal courts on matters of public interest.  The Attorney General has the authority to file suit to challenge actions by the federal government that threaten the public interest and welfare of Maine residents as a matter of constitutional, statutory, and common-law authority.

55.     The Governor of Maine, Janet T. Mills, is the chief executive officer of the State. The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  As the leader of the executive branch, the Governor is the chief of Maine's executive branch agencies, including those whose injuries are discussed in this Complaint.  Me. Const. art V, § 1.  Governor Mills is the Commander-in-Chief of the Maine National Guard.  37-B M.R.S. §§ 103 et seq.

56.     On information and belief, Maine is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by Defendants' reduction of federal defense spending in Maine due to diversion of funding to the border wall.

57.     Maine has an interest in protecting the health, safety, and well-being of its residents, including protecting its residents from harms to their economic health.

58.     Maine has an interest in the State's economic vitality and workforce.

59.     Maine has an interest in preventing diminution of its tax revenues.

60.     The diversion of funding from authorized DOD projects in Maine, including on information and belief, military construction projects, will harm Maine's economy.  Maine is further injured by the possible loss of equipment to its National Guard units as a result of

13

Defendants' diversion of funds toward the border wall.

61.     Maine has benefitted in the past from equipment purchased through funds made available by Congress for use by state National Guards.

62.     The diversion of said funds will harm Maine to the extent such diversion results in elimination or reduction of the pool of federal funds available for the purchase of military equipment in the future.

**PLAINTIFF STATE OF MARYLAND**

63.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge actions by the federal government that threaten the public interest and welfare of Maryland residents.  Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

64.     On information and belief, Maryland is aggrieved by the actions of Defendants and has standing to bring this action because of the injury due to the diversion of funding for military construction projects and procurement of military equipment.  Defendants' actions will hurt Maryland's economy, reduce state tax revenues, and impair our National Guard units.  Defense spending in Maryland makes up a significant portion of the state economy.  In 2017, defense spending accounted for 5.3 percent of the State's GDP – the fifth highest percentage in the country.[11]

65.     DOD's reprogramming action includes a substantial reduction in federal procurement of F-35 and C-130J aircraft, which are produced by Lockheed Martin, a defense contractor headquartered and located in Maryland.  The F-35 program is Lockheed's largest, accounting for 27 percent of its net sales in 2019 and expected to represent an even higher percentage of sales in future years.  Cuts to the F-35 program will significantly lessen the taxable income of Lockheed Martin and negatively impact state revenues, as will the reprogramming of funds for C-130J aircraft.

[11] *DOD Defense Spending by State*, *supra* note 2, at 4.

14

66.      Maryland's economy is also threatened by the potential diversion of military construction funds.  On information and belief, in FY 2020, Maryland stands to lose as much as $614 million in military construction funding that would otherwise flow into the state economy.  At-risk projects include the Presidential Aircraft Recapitalization Complex at Joint Base Andrews, a new operations building at Fort Meade, an air traffic control tower in St. Inigoes, and a U.S. Army Medical Research facility at Fort Detrick.

67.      Maryland is further injured by the potential loss of equipment to its National Guard units.  The Maryland National Guard is composed of over 6,000 soldiers and airmen, operates over 70 facilities around the state, and has an annual fiscal impact of more than $300 million.  The Maryland National Guard serves a number of crucial roles, including as the first military responder to threats to the State, including natural disasters, and supporting the national defense, including through active service in overseas combat.  The loss of funding for equipment would negatively affect the Guard's ability to provide these valuable services.

**PLAINTIFF COMMONWEALTH OF MASSACHUSETTS**

68.      The Commonwealth of Massachusetts, represented by and through its Attorney General, is a sovereign state of the United States of America.

69.      Attorney General Maura Healey is the chief law enforcement officer in Massachusetts and has both statutory and common-law authority to bring lawsuits to protect the interests of the Commonwealth of Massachusetts and the public interest of the people.  *Feeney v. Commonwealth*, 366 N.E.2d 1262, 1265-66 (Mass. 1977); Mass. Gen. Laws Ch. 12, § 3, 10.

70.      Massachusetts is aggrieved by the actions of Defendants and has standing to bring this action because of injury due to the potential loss of funds for DOD projects in Massachusetts, including, on information and belief, military construction projects, and equipment procurement for the Massachusetts National Guard, caused by Defendants' unlawful diversion of funding to pay for border wall construction.

71.      Military construction project funds that have been appropriated by Congress and could be diverted include funds for projects for the State's Army, Army Reserve, Air Force, and Army National Guard units.  For example, $9.7 million in military construction funding has been

15

appropriated for a multi-purpose machine gun range for the Massachusetts National Guard in FY 2020.

72.     Not only are these military construction projects important to national security, military readiness, and the well-being of our service members, they are important generators of economic activity for Massachusetts.

73.     Massachusetts is further injured by the possible loss of equipment for its National Guard units.

74.     The Massachusetts National Guard consists of 6,225 Army Guard members and 2,127 Air Guard members, and maintains a presence in every region of Massachusetts, with 45 sites in 38 communities.

75.     For the past 381 years, Massachusetts National Guard members have served in every major armed conflict and have responded to numerous emergencies in Massachusetts and elsewhere in the United States.

76.     The Massachusetts National Guard has a number of pending requests for equipment from DOD, including to fill shortages and upgrade older weapons, and to upgrade digital battle command systems.  The Massachusetts National Guard expects to make additional equipment procurement requests in FY 2020, as it consistently makes requests to DOD to fill equipment shortages throughout the year.

77.     This equipment is important to the Massachusetts National Guard's preparedness to meet and support national security directives and objectives, to respond to natural disasters and other emergencies, and to support the safety and security of Massachusetts residents.

## PLAINTIFF ATTORNEY GENERAL DANA NESSEL ON BEHALF OF THE PEOPLE OF MICHIGAN

78.     The People of Michigan are the sovereign of one of the states of the United States and are represented by and through the Michigan Attorney General Dana Nessel.

79.     Attorney General Dana Nessel is the chief legal officer of the State of Michigan and her powers and duties include acting in federal court in matters of concern to the People of Michigan, to protect Michigan residents.  *Fieger v. Cox*, 734 N.W.2d 602, 604 (Mich. Ct. App.

16

2007); Mich. Comp. Laws §§ 14.28, 14.101.  This action is brought to protect the interests of the People of Michigan.

80.     Michigan is aggrieved by the actions of Defendants and has standing to bring this action because of the injury caused by the loss of defense spending in the State, including, on information and belief, the loss of funding for military construction projects, as a result of Defendants' unlawful diversion.  As of 2017, annual defense spending injected $3.8 billion into Michigan's economy, accounting for almost 1 percent of the State's per capita gross domestic product.[12]

81.     Michigan is further injured by the possible diversion of defense funding for projects supporting the State's National Guard units.  The Michigan National Guard has over 10,000 soldiers and airmen, employs over 700 state employees on a full-time basis through the Department of Military and Veterans Affairs, and operates over 40 facilities in the State.  The Michigan Department of Military and Veterans Affairs receives a majority of its funding from the federal government.  It prepares citizen soldiers and airmen to respond to, among other things, state emergencies, military support, and protection of local communities.

82.     On information and belief, the loss of funding for equipment for Michigan's National Guard negatively impacts this vital service for the People of Michigan.  This diversion diminishes Michigan's opportunity to seek equipment that the Michigan National Guard would use to provide public safety support to civil authorities in times of emergency such as natural disasters and to provide mission-ready forces to the federal government.

**PLAINTIFF STATE OF MINNESOTA**

83.     The State of Minnesota, represented by and through its Attorney General, is a sovereign state of the United States of America.

84.     Attorney General Keith Ellison is the chief legal officer of the State of Minnesota and has the authority to file civil actions to protect Minnesota's rights and interests.  Minn. Const., art. V, § 1; Minn. Stat. §§ 8.01, 8.06 (2018).  This action is brought pursuant to the Attorney General's authority and responsibility to protect Minnesota's sovereign, quasi-

---

[12] *FY 2017 DOD Defense Spending by State*, *supra* note 2, at 6.

1    sovereign, and proprietary interests.

2         85.    Governor Tim Walz is the chief executive officer of the State of Minnesota.  The

3    Governor is responsible for overseeing the operations of the State and ensuring that its laws are

4    faithfully executed.  As the leader of the executive branch, the Governor is the commander-in-

5    chief of Minnesota's military and the chief of Minnesota's executive branch agencies.  Minn.

6    Const., art. V, § 3; Minn. Stat. §§ 4.04, 190.02 (2018).

7         86.    On information and belief, Minnesota is aggrieved by the actions of Defendants

8    and has standing to bring this action because of the injury caused by Defendants' unlawful and

9    unconstitutional diversion of funding from Minnesota toward the construction of a border wall in

10   Texas, Arizona, New Mexico, and California.  Defendants' actions will hurt Minnesota's

11   economy, reduce state tax revenues, damage the State's critical security infrastructure, impair

12   National Guard readiness, and threaten the safety of Minnesota's National Guard units and of all

13   Minnesota residents.

14        87.    Defense spending in Minnesota is critical not only for national military readiness

15   but also to Minnesota's economy.  Defendants' planned funding diversions threaten to harm the

16   Minnesota's economy, employment, and tax revenues.  In 2017, annual defense spending injected

17   $4.6 billion into Minnesota's economy—accounting for 1.3 percent of the state's GDP—when

18   including payments to defense contractors.[13]

19        88.    Minnesota is further injured by the potential loss of equipment to its National

20   Guard that implicates force readiness and the ability of the Minnesota National Guard to protect

21   the safety and health of Minnesota residents in the face of natural disasters and other domestic

22   emergencies.  The Minnesota National Guard has over 13,000 soldiers and airmen, employs more

23   than 2,000 people on a full-time basis, and operates over 60 facilities in the State.  The Minnesota

24   National Guard receives more than 96 percent of its funding from the federal government.  The

25   Minnesota National Guard prepares citizen soldiers and airmen to respond to, among other things,

26   the Governor of Minnesota for state emergency response, military support, and protection of local

27   communities.

28   _____

[13] *FY 2017 DOD Defense Spending by State*, *supra* note 2, at 6.

89.     Any denial of replacement equipment as a result of the funding diversion for border wall construction will negatively affect the capabilities and readiness of the Minnesota National Guard.  To keep the past-due equipment in service, the Minnesota National Guard will have to spend greater employee time and more money on repairs.  The Minnesota National Guard, thus, will have to draw funding and work hours away from the Minnesota National Guard's core mission in order to prolong the useful life of equipment otherwise due for replacement.

90.     In addition, Minnesota, its economy, and its residents will be harmed by any diversion of federal funding from necessary military construction projects in Minnesota to construct a wall along the United States-Mexico border.  Such projects are competitively bid by private, independent contractors who pay wages to their laborers and purchase construction materials from commercial suppliers.

## PLAINTIFF STATE OF NEVADA

91.     The State of Nevada, represented by and through its Attorney General, is a sovereign state of the United States of America.

92.     Attorney General Aaron D. Ford is the chief legal officer of the State of Nevada and has the authority to commence actions in federal court to protect the interests of the State. Nev. Rev. Stat. 228.170.

93.     Governor Stephen F. Sisolak is the chief executive officer of the State of Nevada. The Governor is responsible for overseeing the operations of the State and ensuring that its laws are faithfully executed.  Nev. Const., art. 5, § 1.  Governor Sisolak is the Commander-in-Chief of the Nevada state military forces.  *Id*., art. 5, § 5.

94.     On information and belief, Nevada is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to the State and its residents caused by Defendants' diversion of funding to a southern border wall.  Defendants' unconstitutional actions undermine Nevada's sovereignty and harm the State through their effects on Nevada's residents and its economy.

95.     Any diversion of military construction funding from Nevada will harm the State's

economy. Nevada is home to several military bases, including Nellis Air Force Base, Creech Air Force Base, Hawthorne Army Depot Base, and Naval Air Station Fallon. These military bases play a critical role in our nation's defense and the State's economy. The use of funding for a southern border wall rather than toward necessary military construction projects at these bases harms Nevada and its economy.

96.     Nevada is harmed by the loss of other defense spending in the State. As of 2017, annual defense spending injects $2.3 billion into Nevada's economy and is responsible for 21,175 jobs.

97.     The diversion of DOD funding for projects supporting or used by Nevada's National Guard units harms the State. The Nevada National Guard has over 3,000 soldiers, over 1,000 air members, and operates 17 facilities in the State. The Nevada National Guard receives more than 79 percent of its funding from the federal government. The purpose of the Nevada National Guard includes providing emergency public safety support to civil authorities as directed by the Governor.

98.     Nevada is further injured by the loss of equipment to its National Guard, as it impacts its ability to provide a domestic response for natural disasters within and outside of Nevada. Specifically, the Nevada National Guard has requested critical dual use items for its units throughout Nevada, including multiple trailers and a forklift to address critical shortages. On information and belief, DOD's reprogramming action threatens the availability of funds to meet the Nevada National Guard's need for equipment.

99.     Upon information and belief, the Nevada National Guard is a possible finalist for one of the C-130J aircraft subject to DOD's reprogramming action. Monies for such aircraft, instead of being used for critical firefighting purposes for the benefit of Nevada, may instead be improperly redirected toward construction of the border wall.

**PLAINTIFF STATE OF NEW JERSEY**

100.     The State of New Jersey is a sovereign state of the United States of America.

101.     This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. *See* N.J. Stat. Ann. § 52:17A-4(e), (g).

102.    On information and belief, New Jersey is aggrieved by the actions of Defendants and has standing to bring this action because of the injury caused by the loss of defense spending, including for military construction projects, in the State as a result of Defendants' unlawful diversion.  In FY 2019, Congress appropriated $61 million for military construction projects in New Jersey, which, upon information and belief, are at risk to be diverted for border wall construction.  These projects are critical to national security infrastructure.  And the diversion of such funds to the construction of a border wall will hurt New Jersey's economy and affects business in the State.

103.    New Jersey may be affected by the potential loss of equipment to its National Guard.  The New Jersey National Guard has over 8,000 soldiers and employs 1,500 people on a full-time basis, and operates 365 facilities in the State.  The New Jersey National Guard receives nearly 85 percent of its funding from the federal government.  The New Jersey National Guard provides emergency public safety to civil authorities.

104.    The New Jersey Armed Reserve National Guard, facilitated through the United States Property and Fiscal Office in New Jersey, has traditionally submitted requests for consideration for National Guard and Reserve Equipment Account funding, which DOD seeks to divert funding from in its reprogramming action.  In FY 2019 and FY 2020, New Jersey initiated requests for such equipment through traditional channels.  New Jersey has received a limited response to these requests.

105.    In filing this action, the Attorney General seeks to protect the residents and agencies of New Jersey from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to New Jersey by Defendants' actions.  Those injuries include harm to New Jersey's sovereign, quasi-sovereign, and proprietary interests.

## PLAINTIFF STATE OF NEW MEXICO

106.    The State of New Mexico, represented by and through its Attorney General, is a sovereign state of the United States of America.

107.    Attorney General Hector Balderas is the chief legal officer of the State of New Mexico.  He is authorized to prosecute all actions and proceedings on behalf of New Mexico

1    when, in his judgment, the interest of the State requires such action.  N.M. Stat. Ann. § 8-5-2(B).

2    This challenge is brought pursuant to Attorney General Balderas's statutory and common law

3    authority.

4         108.    Governor Michelle Lujan Grisham possesses the "supreme executive power" of

5    the State of New Mexico.  N.M. Const., art. V, § 4.  She has the responsibility to execute the laws

6    of the State and preserve the public peace.  *Id.*  She also has the authority to oversee the State's

7    agencies that will be affected by Defendants' actions.  N.M. Const., art. V, § 5.

8         109.    New Mexico shares over 179 miles of its southern border with Mexico.  This close

9    relationship gives New Mexico a special interest in the economic and public safety consequences

10   of cross-border activity.  Attorney General Balderas has worked with law enforcement

11   counterparts in Mexico to facilitate international extraditions, implement technologies to combat

12   human trafficking, and train prosecutors.[14]  Trade across New Mexico's southern border is a

13   crucial component of the State's economy, with Mexico its largest export partner.[15]

14        110.    New Mexico has an interest in its exercise of sovereign power over individuals and

15   entities within the State, including enforcement of its legal code.  *Snapp*, 458 U.S. at 601; *Hawaii*,

16   859 F.3d at 765.

17        111.    New Mexico is aggrieved by Defendants' actions and has standing to bring this

18   action because of injury due to the possible loss of funds for DOD projects and equipment

19   procurement for the New Mexico National Guard.  Funds that could be diverted include, but may

20   not be limited to $7 million for a security gate and $57.9 million for a helicopter simulator and

21   replacement facility in New Mexico.

22        112.    The loss of these funds would harm New Mexico's economy, employment and

23

24        [14] Ryan Boetel, *Attorney General Announces Pilot Project for Mexico Extraditions*,
     Albuquerque J. (July 25, 2018), https://tinyurl.com/y2zdbc8h; PR Newswire, *TrustStamp and the*
25   *Conference of Western Attorneys General Alliance Partnership Introduce Technology to Ease*
     *Data Sharing Among Law Enforcement* (Aug. 30, 2018), https://tinyurl.com/y2seu64t; Carol
26   Clark, *AG Balderas Trains Mexican Prosecutors, Forensic Scientists, Investigators in Effort to*
     *Stop Crime From Crossing Border*, Los Alamos Daily Post (Nov. 3, 2017),
     https://tinyurl.com/y3mcvrms.
27        [15] Int'l Trade Admin., *New Mexico Exports, Jobs, & Foreign Investment* (Feb. 2018),
     https://tinyurl.com/y25tsost.
28

1    taxes.  As of 2017, annual defense spending injected $2.6 billion into New Mexico's economy,

2    providing approximately $1,250 per resident of the State, where 23,864 military personnel

3    reside,[16] constituting a significant portion of the State's current population of 2,096,829.

4          113.    Defendants' use of the diverted funds to construct parts of their border wall in

5    New Mexico will also harm New Mexico's sovereign interests by imposing environmental harm

6    to the State.  The environmental damage caused by a border wall in New Mexico would include

7    the blocking of wildlife migration, flooding, and habitat loss.[17]

8                              **PLAINTIFF STATE OF NEW YORK**

9          114.    The State of New York, represented by and through its Attorney General, is a

10   sovereign state of the United States of America.  Attorney General Letitia James is New York

11   State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y.

12   Executive Law section 63.

13         115.    Upon information and belief, Defendants' unlawful diversion of funding from

14   DOD projects, including military construction projects, in New York to construction of a border

15   wall will injure New York's economy and, by damaging the State's critical security

16   infrastructure, threaten the safety of New York's National Guard and of all New York residents.

17         116.    New York is further injured by the potential loss of equipment to its National

18   Guard.

19                              **PLAINTIFF STATE OF OREGON**

20         117.    Plaintiff State of Oregon, acting through its Attorney General, Ellen Rosenblum, is

21   a sovereign state of the United States of America.

22         118.    Attorney General Rosenblum is the chief law officer of Oregon and is empowered

23   to bring this action on behalf of the State of Oregon and the affected state agencies under ORS

24   160.060, ORS 180.210, and ORS 180.220.

25         119.    On information and belief, Oregon is aggrieved by the actions of Defendants and

26   _____

27   [16] *FY 2017 DOD Defense Spending by State*, *supra* note 2, at 6.
     [17] *See* Robert Peters et al., *Nature Divided, Scientists United: US–Mexico Border Wall
28   Threatens Biodiversity and Binational Conservation*, 68 BioScience 740, 743 (Oct. 2018),
     https://tinyurl.com/y3t4ymfn.

has standing to bring this action because of the injury caused by the threatened loss of defense spending in Oregon as a result of Defendants' unlawful diversion.

120.     On information and belief, Oregon is further injured by the threatened loss of equipment for its National Guard in ways that implicate force readiness and the ability of the Oregon National Guard to protect the safety and health of Oregon residents in the face of natural disasters and other domestic emergencies.  Oregon's Army National Guard has requested FY 2020 funding from the National Guard and Reserve Equipment Account, from which Defendants seek to divert funding.  That requested funding is for modernization and equipment that are essential for force readiness.

**PLAINTIFF STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS**

121.     The State of Rhode Island, represented by and through its Attorney General, is a sovereign state of the United States of America.

122.     Attorney General Peter F. Neronha is the chief law officer of the State of Rhode Island and has the authority to file civil actions to protect Rhode Island's rights and the rights of Rhode Island citizens.  The Attorney General has the authority to file suit to take legal action against the federal government for the protection of the public interest and welfare of Rhode Island citizens as a matter of constitutional, statutory, and common law authority.  R.I. Const. art. IX, sec. 12; R.I. Gen. Laws §§ 42-9-1, et seq.; *see also State v. Lead Industries Ass'n*, 951 A.2d 428 (R.I. 2008).

123.     The Governor of Rhode Island, Gina M. Raimondo, is the chief executive officer of the State of Rhode Island.  The Governor oversees the operations of the State and is in charge of the State military, the Rhode Island National Guard, which is comprised of the Rhode Island Army National Guard, Rhode Island Air National Guard, and the Historic Rhode Island Militia (collectively, "RING").

124.     Upon information and belief, Rhode Island is aggrieved by the actions of Defendants and has standing to bring this action because of the injury caused by Defendants' unlawful and unconstitutional diversion of funding from national guard procurement accounts, military projects, and military construction projects in Rhode Island toward the construction of a

24

border wall in Texas, Arizona, New Mexico, and California.  Defendants' actions will harm Rhode Island's economy, reduce state tax revenues, damage Rhode Island's critical security infrastructure, impair National Guard readiness, and threaten the safety of Rhode Island's National Guard and of all Rhode Island residents.

125.    RING is the oldest military branch in the United States and consists of over 3,300 members (2,178 in the Army National Guard, 1,136 in the Air National Guard) and is responsible for responding to statewide civil emergencies declared by the Governor, as well as supporting the defense of the nation and national security interests.

126.    There exists between the State of Rhode Island and National Guard Bureau ("NGB") a legal contract referred to as the Master Cooperative Agreement ("MCA").  The MCA provides for Rhode Island support for the federal mission in the form of employment of state personnel, the purchase of goods and services through state vendors, and provides a readied, state-of-the-art trained military force.  Rhode Island is obligated through the MCA to match the federal funds with general revenues as a condition of the grant.

127.    Overall, RING is financed with approximately 25 percent state capital funds and 75 percent federal funds, as well as direct federal funding for active duty guardsmen, services, and construction costs.  Military training is 100 percent federally financed.

128.    Throughout Rhode Island, RING operates 14 armories, 4 aviation support facilities, 2 training sites, and 6 logistical sites.  The equipment housed and secured at these facilities is valued in excess of $500 million dollars.  The estimated annual impact on the State attributed to National Guard programs exceeds $238 million dollars.[18]

129.    Two of the RING aviation support facilities are located at Quonset Point in North Kingston, Rhode Island, and consist of the Quonset Point Armory, operated by the Rhode Island Army National Guard, and the Quonset Point Air Station, operated by the Rhode Island Air National Guard ("Quonset Airbase").

130.    The Quonset Airbase operates maintenance facilities for RING aircrafts, vehicles,

---

[18] State of Rhode Island and Providence Plantations, *Fiscal Year Budget*, Vol. IV, 103-111 (Jan. 2018), http://tinyurl.com/y3nucc5s.

and equipment, and serves as unit headquarters, meeting places, and equipment and personal effects storage areas for both Army Guard and Air Guard units.  The Quonset Airbase is maintained with 75 percent federal funds and 25 percent state capital funds.

131.    For FY 2020, the Governor recommended expenditures of $28.7 million for various projects at the Quonset Airbase, to be funded 100 percent by the National Guard Bureau ("NGB") federal funds.  Several of these projects will provide benefits to Rhode Island for commercial aviation utilizing Quonset State Airport.[19]

132.    Upon information and belief, Rhode Island is harmed by the loss of military construction spending in the State.  In or about March 2019, the Office of the Under Secretary of Defense published an annual list of military construction projects ("C-1") to the DOD oversight committees of Congress, coinciding with the transmittal of the President's Budget.  The C-1 Military Construction list obligates $11,600,000 in DOD funds to the Rhode Island National Guard for military construction and repair of a fuel storage complex at the Quonset Airbase.

133.    Upon information and belief, Rhode Island is further injured by the loss of defense contractor spending in the State.  Defense spending in Rhode Island is critical not just to national military readiness but to Rhode Island's economy.  The Trump Administration's planned funding diversions threaten to harm the Rhode Island's economy, employment, and tax revenues.  As of FY 2018, annual defense spending injected $1.5 billion into Rhode Island's economy, accounting for 2.4 percent of Rhode Island's total GDP—ranking Rhode Island among the top 25 states for defense spending as a share of GDP.[20]

134.    A significant number of defense contractors operate facilities in Rhode Island, including Raytheon, Systems Engineering Associate, BAE Systems, Northrop Grumman, McLaughlin Research Corp., Mikel Inc. L3 Technologies, Rite-Solutions, Hyman Brickle & Son

---

[19] State of Rhode Island, *FY 2020 Capital Budget (FY 2020 – FY 2024 Capital Improvement Plan)*, 80-82 (Jan. 2019), available at https://tinyurl.com/vwlluj4. The enacted FY 2020 State Budget allocated $28,720,000 in NGB federal funds for construction projects at the Quonset Airbase. *Id.* at 122.

[20] DOD, Off. of Econ. Adjustment, *Defense Spending by State Fiscal Year 2018*, 8, https://tinyurl.com/rjltz3p (last visited Feb. 27, 2020) (FY 2018 DOD Spending by State Report).

Inc., and Asgard Partners & Co. LLC.  These defense contractors employ over 12,000 military and civilian employees in Rhode Island, and received over $700 million in defense contract awards, and spent approximately $800 million on payroll in FY 2018.

135.    Upon information and belief, DOD's reprogramming action diverts funding away from critical military projects for which defense contractors in Rhode Island produce key components and provide research and development, supplies and equipment, and other services.

136.    For example, the reprogramming slashes both the Navy's and Air Force's variants of the Lockheed Martin F-35 Lightning II, which utilize a Distributed Aperture System ("DAS") sensor,[21] manufactured by Northrop Grumman and Raytheon.  The reprogramming further slashes the Navy's and Air Force's variants of the Boeing P-8A Poseidon, which utilizes AN/APY-10 radar, designed and manufactured by Raytheon,[22] and the Boeing V-22 Osprey, which uses additional electronic equipment also designed and manufactured by Raytheon.[23]

137.    Defense funds used for research and development, production, and service of these highly specialized electronics are injected directly into Rhode Island's economy, and further support not only thousands of Rhode Island-based employees but also the companies and employees of all Rhode Island-based companies in Raytheon's supply chain.  Each of those employees, and the company itself, pays state taxes, and Rhode Island has a powerful interest in preventing the diminution of specific tax revenues caused by reduced procurement of military equipment and the corresponding reduction in economic activity.  *See Wyoming,* 502 U.S. at 448-450.

138.    Upon information and belief, Rhode Island is further injured by the threatened loss of equipment and vehicle modernization programs for its National Guard.

139.    To be ready to serve, RING requires the replacement of a number of Humvees. The Trump Administration's attempt to slash $100 million in Humvee modernization funds

---

[21] The DAS sensor collects 360-degree high resolution images and transmits them in real-time directly to the pilot's helmet, and virtually allowing the pilot of the F-35 to virtually see through the bottom of the aircraft.

[22] Raytheon, *AN/APY-10 Maritime, Littoral and Overland Surveillance Radar*, https://www.raytheon.com/capabilities/products/apy10 (last accessed Feb. 29, 2020).

[23] Raytheon, *V-22 Osprey Modernization and Sustainment*, https://www.raytheon.com/capabilities/products/v-22 (last accessed Feb. 29, 2020).

threatens RING's ability to modernize and replace this critical equipment.  RING also utilizes

funds from the National Guard and Reserve Equipment Account, from which Defendants seek to

divert funding, to secure essential equipment necessary for rapid deployment and overall force

readiness.  The unavailability of these funds will prevent RING from securing essential

equipment and adversely affect RING's readiness and ability to protect the safety and health of

Rhode Island residents in the face of natural disasters and other domestic emergencies.

**PLAINTIFF STATE OF VERMONT**

140.    The State of Vermont, represented by and through its Attorney General, is a

sovereign state of the United States of America.

141.    Attorney General Thomas J. Donovan is the chief legal officer of the State of

Vermont and has the authority to file civil actions to protect Vermont's rights and interests.  Vt.

Stat. Ann. tit. 3, §§ 152, 157.

142.    Vermont is aggrieved by the actions of Defendants and has standing to bring this

action because of the injury due to the potential loss of equipment to its National Guard units.

143.    The Vermont National Guard, consisting of the Army National Guard and the Air

National Guard, serves as a military force available to the governor in the event of state

emergencies which exceed the capacity of the civil authorities.  The Vermont National Guard's

mission is to serve, protect, and defend the citizens of Vermont and the Nation.  The National

Guard consists of over 2,400 members and operates facilities throughout Vermont including 22

armories, 1 Army Aviation Support Facility, 5 Field Maintenance Shops, the Ethan Allen Firing

Range, Camp Johnson, and the Ethan Allen Air Force Base.

144.    On information and belief, the diversion of funds for military equipment

supporting or used by the Vermont National Guard would interfere with the Vermont National

Guard's ability to provide these services for the State, thereby injuring the State and its residents.

**PLAINTIFF COMMONWEALTH OF VIRGINIA**

145.    The Commonwealth of Virginia is a sovereign state of the United States of

America.

146.    The Commonwealth of Virginia brings this action by and through its Attorney

General, Mark R. Herring.  The Attorney General has authority to represent the Commonwealth, its departments, and its agencies in "all civil litigation in which any of them are interested."  Va. Code Ann. § 2.2-507(A).  In filing this action, the Attorney General seeks to protect the Commonwealth and its residents from harm caused by Defendants' illegal conduct, prevent further harm, and seek redress for the injuries caused to Virginia and its residents by Defendants' illegal diversion of federal funds to build the border wall.

147.    The Governor of Virginia, Ralph S. Northam, is the chief executive officer of the Commonwealth of Virginia.  The Governor oversees the operations of the Commonwealth and is the Commander-in-Chief of Virginia's armed forces.  See Va. Const. art. V, § 7; Va. Code Ann. § 44-8.  The Adjutant General, Timothy P. Williams, oversees the militia of the Commonwealth of Virginia, including the Virginia National Guard, "subject to the orders of the Governor as Commander in Chief."  Va. Code Ann. § 44-13.

148.    Defense spending in Virginia is critical not just to national military readiness but also to Virginia's economy.  The Administration's planned funding diversions threaten to harm the Virginia's economy, employment, and tax revenues.  As of 2017, annual defense spending injected $46.2 billion into Virginia's economy, accounting for 8.9 percent of the Virginia's per capita GDP – a higher percentage than any other state.[24]

149.    On information and belief, Virginia would be aggrieved by Defendants' diversion of federal funding for DOD projects in the Commonwealth, including military construction projects.  In FY 2020 alone, Congress has appropriated $631.3 million in funds for military construction projects in Virginia.  The loss of funding for even some of these projects would harm Virginia's economy, employment, and tax revenues.

150.    Virginia is further injured by the loss of equipment to its National Guard.  The Virginia National Guard receives roughly 97 percent of its funding from the federal government. The Virginia National Guard has received equipment from the federal government that is housed and secured at Virginia National Guard's facilities, and is valued in excess of $1.8 billion.  That equipment is used to further the Virginia National Guard's efforts to assist civil authorities in

[24] *DOD Defense Spending by State*, *supra* note 2, at 4.

protecting life and property and to preserve peace, order, and public safety during emergencies.

151.    There are roughly 8,705 guardsmen of the Virginia National Guard, across the Virginia Army National Guard, the Virginia Air National Guard, and the Virginia Defense Force. The Virginia National Guard also employs some 410 civilian personnel.  The guardsmen and civilian personnel of the Virginia National Guard play a vital role in Virginia's economy, including by bringing in more than $250 million in annual income into the Commonwealth.

152.    On information and belief, the diversion of funds for military equipment supporting or used by the Virginia National would interfere with the Virginia National Guard's ability to provide vital services for the Commonwealth, thereby injuring Virginia and its residents.

**PLAINTIFF STATE OF WISCONSIN**

153.    The State of Wisconsin is a sovereign state of the United States of America.

154.    Governor Tony Evers is the chief executive officer of the State of Wisconsin and has the duty to "take care that the laws be faithfully executed."  Wis. Const. art. V, §§ 1, 4.  The Governor is the commander-in-chief of the military and naval forces of the State, including the Wisconsin National Guard.  Wis. Const. art. V, § 1.  The Governor is the chief of Wisconsin's executive branch agencies, including agencies that will suffer injuries discussed in this complaint.

155.    Attorney General Joshua L. Kaul is the chief legal officer of the State of Wisconsin and has the authority to file civil actions to protect Wisconsin's rights and interests. *See* Wis. Stat. § 165.25(1m).  The Attorney General's powers and duties include appearing for and representing the State, on the Governor's request, "in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." *Id.*

156.    The State of Wisconsin brings this action by and through its Attorney General, Joshua L. Kaul.

157.    In filing this action, the Attorney General seeks to redress and prevent injuries to the State and its residents caused by Defendants' illegal diversion of federal funds to build the

border wall.  These injuries include harms to Wisconsin's sovereign, quasi-sovereign, and proprietary interests.

158.    Wisconsin has an interest in protecting the State's economy and security, as well as the health, safety, and welfare of its residents.

159.    Wisconsin has an interest in protecting its tax revenues, including those resulting from economic activity from military projects in Wisconsin.

160.    Wisconsin is home to multiple military bases, which play a critical role in our nation's defense and in Wisconsin's economy.

161.    On information and belief, Defendants' diversion of funds for the border wall threatens over $97 million in military construction funding for projects currently planned in Wisconsin.

162.    Defendants' diversion of funds allocated to necessary maintenance and repairs at these military bases would harm Wisconsin's economy and the economic welfare of Wisconsin residents.

163.    Additionally, the Wisconsin National Guard has over 10,000 soldiers and airmen who are trained to assist civil authorities in protecting life and property, and in preserving peace, order, and public safety during emergencies, as directed by the Governor of Wisconsin.  The Wisconsin National Guard receives a majority of its funding from the federal government.

164.    On information and belief, Defendants' latest diversion of funds for the border wall will include $790 million in funds currently designated for equipment for the states' National Guards.

165.    Defendants' diversion of funding for equipment supporting or used by the National Guard would interfere with the Wisconsin National Guard's ability to provide necessary services for Wisconsin, thereby injuring the State and its residents.

166.    On information and belief, Defendants' diversion of funds includes the diversion of $101 million in funds for Heavy Expanded Mobile Tactical Trucks, *see California*, ECF No. 271-1, Ex. C at 2, that are exclusively manufactured by a Wisconsin-based company.

167.    On information and belief, Defendants' diversion of funds for military equipment or services would result in the loss of revenue to Wisconsin-based companies and potentially the loss of hundreds of jobs due to the decreased production needs of those companies.

168.    These decreased revenues and job losses resulting from Defendants' diversion would harm Wisconsin's economy and the economic welfare of Wisconsin residents.

## DEFENDANTS

169.    Defendant Donald J. Trump, the President of the United States of America, is responsible for the actions and decisions that are being challenged by Plaintiffs in this action and is sued in his official capacity.

170.    Defendant United States of America is responsible for enforcing laws that are consistent with the United States Constitution.

171.    Defendant DOD is the federal agency to which Congress has appropriated the military construction and drug interdiction funding implicated by the President's Executive Actions.  Defendant DOD is an executive department of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. § 702, and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

172.    Defendant Mark T. Esper, Secretary of Defense, oversees the DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action. Defendant Esper is sued in his official capacity pursuant to 5 U.S.C. § 702.

173.    Defendant Ryan D. McCarthy, Secretary of the Army, oversees the United States Army within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant McCarthy is sued in his official capacity pursuant to 5 U.S.C. § 702.

174.    Defendant Thomas B. Modly, Acting Secretary of the Navy, oversees the United States Navy within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Modly is sued in his official capacity pursuant to 5 U.S.C. § 702.

175.     Defendant Barbara M. Barrett, Secretary of the Air Force, oversees the United States Air Force within DOD, and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Barrett is sued in her official capacity pursuant to 5 U.S.C. § 702.

176.     Defendant Department of Homeland Security ("DHS") is the federal agency responsible for providing border security along the United States-Mexico border in a manner that is consistent with the laws and Constitution of the United States.  Defendant DHS is an executive department of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. § 702, and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

177.     Defendant Chad F. Wolf, Acting Secretary of DHS, oversees DHS and is responsible for the actions and decisions that are being challenged by Plaintiffs in this action.  Defendant Wolf is sued in his official capacity pursuant to 5 U.S.C. § 702.

178.     Defendant Department of the Interior ("DOI") is the federal agency responsible for managing federal lands.  Defendant DOI is an executive department of the United States of America pursuant to 5 U.S.C. § 101, and a federal agency within the meaning of 28 U.S.C. § 2671.  As such, it engages in agency action within the meaning of 5 U.S.C. § 702, and is named as a defendant in this action pursuant to 5 U.S.C. § 702.

179.     Defendant David Bernhardt, Secretary of the Interior, oversees the Department of the Interior, and is responsible for the actions that are being challenged by Plaintiffs in this action.  Defendant Bernhardt is sued in his official capacity pursuant to 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

### I.   PRESIDENT TRUMP HAS LONG CLAIMED THAT A "CRISIS" AT THE BORDER REQUIRES BUILDING A BORDER WALL, BUT DID NOT DECLARE A NATIONAL EMERGENCY UNTIL CONGRESS DENIED HIM FUNDS TO BUILD IT

180.     Dating back to at least August 2014, President Trump has advocated for a wall along the southern border.[25]

---

[25] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 5, 2014, 1:34 PM), https://tinyurl.com/yydre3ep.

181.   In his speech announcing his candidacy for President in June 2015, President Trump claimed that a border wall is needed to stop a tide of illegal immigration, and that he would build it as President and have Mexico pay for the wall.[26]  In the same speech, he also stated, "When Mexico sends its people, they're not sending their best . . . . They're bringing drugs.  They're bringing crime.  They're rapists."  This claim and his promise to build a wall and have Mexico pay for it became a consistent theme of his campaign.

182.   President Trump repeatedly stated that the border wall he planned to build would help prevent terrorism, crime, and drug smuggling.  For example, on October 4, 2014, President Trump tweeted, "The fight against ISIS starts at our border.  'At least' 10 ISIS have been caught crossing the Mexico border. Build a wall!"[27]  More recently, on February 3, 2019, President Trump tweeted, "If there is no Wall, there is no Security. Human Trafficking, Drugs and Criminals of all dimensions - KEEP OUT!"[28]

183.   On August 27, 2016, President Trump tweeted that "[h]eroin overdoses are taking over our children and others in the MIDWEST.  Coming in from our southern border.  We need strong border & WALL!"[29]

184.   In a speech shortly before the 2016 presidential election, President Trump stated that "[o]n day one [of his Administration], we will begin working on an impenetrable, physical, tall, power [sic], beautiful southern border wall" to "help stop the crisis of illegal crossings" and "stop the drugs and the crime from pouring into our country."[30]

185.   As president, President Trump has continued to repeatedly assert the need for a border wall and his intention to build it.

186.   On February 28, 2017, President Trump delivered an address to a joint session of

---

[26] Time, *Here's Donald Trump's Presidential Announcement Speech* (June 16, 2015), https://tinyurl.com/qzk4wrv.
[27] Donald J. Trump (@realDonaldTrump), Twitter (Oct. 8 2014, 2:26 PM), https://tinyurl.com/yxntlamo.
[28] *Id.* (Feb. 3, 2019, 2:03 PM), https://tinyurl.com/yywmw9yx.
[29] *Id.* (Aug. 27, 2016, 7:17 AM), https://tinyurl.com/y3f6bp9s.
[30] N.Y. Times, *Transcript of Donald Trump's Immigration Speech* (Sept. 1, 2016), https://tinyurl.com/yalom4hl.

34

Congress in which he stated that in order to "restore integrity and the rule of law at our

borders . . . we will soon begin the construction of a great, great wall along our southern

border."[31]

187.    In his 2018 State of the Union address, President Trump stated that "open borders

have allowed drugs and gangs to pour into our most vulnerable communities. . . .   Most

tragically, they have caused the loss of many innocent lives[,]" and called for "building a wall on

the Southern border" as part of the President's plan to "fully secure[] the border."[32]

188.    On March 19, 2018, President Trump delivered a speech in which he claimed that

"[n]inety percent of the heroin in America comes from our southern border, where, eventually,

the Democrats will agree with us and we'll build the wall to keep the damn drugs out."[33]

189.    On January 8, 2019, President Trump delivered a speech decrying the southern

border as "a pipeline for vast quantities of illegal drugs, including meth, heroin, cocaine, and

fentanyl[,]" claiming that "thousands of Americans have been brutally killed by those who

illegally entered our country," and discussing his "detailed proposal to secure the border and stop

the criminal gangs, drug smugglers, and human traffickers," including his request for $5.7 billion

for a border wall.[34]

190.    Additional statements by President Trump regarding the border wall include

tweets on December 19, 2018 ("Because of the tremendous dangers at the Border, including large

scale criminal and drug inflow, the United States Military will build the Wall!"),[35] December 31,

2018 ("I campaigned on Border Security, which you cannot have without a strong and powerful

Wall.  Our Southern Border has long been an 'Open Wound,' where drugs, criminals (including

---

[31] White House, *Remarks by President Trump in Joint Address to Congress* (Feb. 28, 2017), https://tinyurl.com/y4kvpj7n.
[32] White House, *President Donald J. Trump's State of the Union Address* (Jan. 30, 2018), https://tinyurl.com/ybtdy.
[33] White House, *Remarks by President Trump on Combatting the Opioid Crisis*, (Mar. 19, 2018), https://tinyurl.com/ybsfq2t8.
[34] White House, *President Donald J. Trump's Address to the Nation on the Crisis at the Border* (Jan. 8, 2019), https://tinyurl.com/y5uloxyg (Trump Border Crisis Address).
[35] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 19, 2018, 5:43 AM), https://tinyurl.com/y95cnd8r.

human traffickers) and illegals would pour into our Country.  Dems should get back here an [sic]

fix now!"),[36] January 27, 2019 ("BUILD A WALL & CRIME WILL FALL!"),[37] and June 2,

2019 ("The Wall is under construction and moving along quickly, despite all of the Radical

Liberal Democrat lawsuits. What are they thinking as our Country is invaded by so many people

(illegals) and things (Drugs) that we do not want. Make America Great Again!").[38]

191.    Indeed, President Trump has made it clear that his plan to build the border wall

would go forward regardless of the actual facts on the ground.  During a speech to the National

Rifle Association, President Trump stated in the context of statistics showing a decrease in

unauthorized border crossings that "we will build the wall no matter how low this number gets or

how this goes.  Don't even think about it.  Don't even think about it."[39]

192.    The salient facts regarding the ostensible "crisis" that President Trump repeatedly

invoked in these numerous statements have not significantly changed since his inauguration as

President in January 2017.

193.    President Trump acknowledged this when he stated that the "emergency" at the

border "began a long time [ago]," citing 2014 as the beginning of the ostensible "crisis at the

border."[40]

194.    There is no evidence of change to the historic pattern of unauthorized immigrants

committing crimes at substantially lower rates than native-born Americans.[41]

195.    The federal government's own data also show that the vast majority of the drugs

smuggled into the country that the President has singled out as dangerous (methamphetamine,

---

[36] *Id.* (Dec. 31, 2018, 5:29 AM), https://tinyurl.com/y6stmopr.
[37] *Id.* (Jan. 27, 2019, 10:22 AM), https://tinyurl.com/wpnjduw.
[38] *Id.* (June 2, 2019, 4:53 AM), https://tinyurl.com/vh8oqy3.
[39] White House, *Remarks by President Trump at the National Rifle Association Leadership Forum* (Apr. 28, 2017), https://tinyurl.com/y5dtnaej.
[40] White House, *Remarks by President Trump before Marine One Departure* (Jan. 10, 2019), https://tinyurl.com/yycew5dk.
[41] *See, e.g.*, Alex Nowrateh, *The Murder of Mollie Tibbetts and Illegal Immigrant Crime: The Facts*, Cato Institute (Aug. 22, 2018), https://tinyurl.com/y5boc9me (showing that "[t]he illegal immigrant conviction rate for homicide was 44 percent *below* that of native-born Americans in 2016 in Texas") (emphasis in original).

heroin, cocaine, and fentanyl)[42] continue to come through, not between, ports of entry.[43]

196.    There continues to be a lack of credible evidence that terrorists are using the southern border as a means of entering the United States, as a State Department report produced under the Trump Administration makes clear.[44]

197.    In his own public statements, President Trump has made clear that his Emergency Declaration and Defendants' ensuing construction of a border wall were triggered by his inability to secure funding for the border wall from Congress rather than any actual crisis at the border.

198.    When asked by the media about his plans to declare a national emergency relating to the border wall, President Trump stated his preference for "do[ing] the deal through Congress," but that if the deal did not "work out" he would "almost . . . definitely" declare a national emergency.[45]  Although he reiterated his unsupported claims about drugs, criminals, and gangs "pouring" across the border between ports of entry and constituting a "crisis," President Trump repeatedly cited the ongoing impasse with Congress as his rationale for the Emergency Declaration.[46]

199.    Around the same time, when asked by the media what his threshold was for declaring a national emergency, rather than cite any actual threshold relating to unauthorized border crossings, President Trump responded, "[m]y threshold will be if I can't make a deal with people that are unreasonable."[47]

200.    On February 1, 2019, President Trump made clear in an interview that he was planning to wait until February 15, the deadline for a congressional conference committee to avert

---

[42] *Trump Border Crisis Address*, *supra* note 34.
[43] CBP, *Enforcement Statistics FY 2019*, https://tinyurl.com/w7fufkn (last visited Feb. 27, 2020) (CBP Enforcement Statistics) (showing that for FY 2019, out of all the drugs seized by CBP in that fiscal year, 88 percent of cocaine, 87 percent of heroin, 83 percent of methamphetamine, and 92 percent of fentanyl were seized by Field Operations at ports of entry).
[44] U.S. Dep't of State, Bureau of Counterterrorism, *Country Reports on Terrorism 2017* 205 (Sept. 2018), https://tinyurl.com/y6klxpxy.
[45] *Remarks by President Trump Before Marine One Departure*, *supra* note 40.
[46] *Id.*
[47] George Sargent, *Trump: I Have the 'Absolute Right' to Declare a National Emergency if Democrats Defy Me*, Wash. Post (Jan 9, 2019), https://tinyurl.com/y4vmtezb.

another government shutdown, before issuing an emergency declaration.[48]  President Trump

claimed he was already building the border wall, and strongly implied that he needed neither

additional funding nor an emergency declaration to build it.[49]  During a press conference that

same day, when asked whether he would consider other options besides the emergency

declaration, President Trump stated that "we will be looking at a national emergency, because I

don't think anything is going to happen [in Congress].  I think the Democrats don't want border

security."[50]  President Trump also repeated his view that the wall was already being built "with

funds that are on hand . . . we're building a lot of wall right now, as we speak . . . [a]nd we're

getting ready to give out some very big contracts with money that we have on hand and money

that comes in."[51]

## II.   CONGRESS HAS APPROPRIATED LIMITED FUNDING TOWARD BORDER BARRIERS AND NO FUNDING TOWARD PRESIDENT TRUMP'S PROPOSED BORDER WALL

201.   Congress has exercised its Article I powers by appropriating funds for the

construction of border barriers and related infrastructure when Congress deemed it appropriate.

During the period of 2005 through 2011, Congress appropriated funding for the construction of

hundreds of miles of border barriers.[52]  According to Border Patrol, as of September 30, 2019,

---

[48] N.Y. Times, *Excerpt from Trump's Interview with the New York Times* (Feb. 1, 2019), https://tinyurl.com/y9gsosk4; *see also* CBS, *Transcript: President Trump on "Face the Nation"* (Feb. 3, 2019), https://tinyurl.com/y8l38g72 (President Trump describing emergency declaration as an "alternative" to the process that Congress was engaged in to avert another shutdown, which was to end on February 15).

[49] *Excerpt from Trump's Interview with the New York Times, supra* note 48 (President Trump stating: "I'm building the wall right now. . . . It's been funded. . . .  We'll be up to, by the end of this year, 115 miles. . . .  At least . . . .  And that doesn't include large amounts of wall that we'll be starting before the end of the year.  So we'll be up to hundreds of miles of wall between new wall and renovation wall in a fairly short period of time. . . .   And I'll continue to build the wall, and we'll get the wall finished. Now whether or not I declare a national emergency, that you'll see."); *see also* Donald J. Trump (@realDonaldTrump), Twitter (Jan. 31, 2019, 9:43 AM), https://tinyurl.com/y56tevok  ("Wall is being built!").

[50] White House, *Remarks by President Trump in Meeting on Human Trafficking on the Southern Border* (Feb. 1, 2019), https://tinyurl.com/y5ghp3eh.

[51] *Id.*

[52] Gov't Accountability Office, *Additional Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance for Identifying Capability Gaps*, GAO-17-331 (Feb. 16, 2017), at 7-10, https://tinyurl.com/yaqbny6e; Gov't Accountability Office, *Secure

---

38

Complaint for Declaratory and Injunctive Relief

1   there was a total of 705 miles of primary, secondary, or tertiary fencing along 654 miles of the

2   southwest border.[53]

3       202.    In the 115th and 116th Congresses, between 2017 and 2019, Congress considered,

4   but repeatedly declined to adopt, legislation appropriating funding for President Trump's

5   proposed border wall.[54]

6       203.    Near the end of the 115th Congress, Congress worked on a funding bill before the

7   December 22, 2018 deadline when federal funding ran out for a number of federal departments.

8   On December 11, 2018, President Trump held a televised meeting with the Democratic leaders of

9   Congress (then-House Minority Leader Nancy Pelosi and Senate Minority Leader Chuck

10  Schumer) to discuss the funding deadline.  At that meeting, President Trump said he wanted $5

11  billion to build a portion of the border wall.  President Trump said at that meeting, "if we don't

12  get what we want one way or the other, whether it's through you, through a military, through

13  anything you want to call, I will shut down the government, absolutely."  President Trump

14  reiterated that he would be "proud to shut down the government for border security."  At the

15  meeting, Leaders Schumer and Pelosi said they disagreed with the President on providing funding

16  *Border Initiative Fence Construction Costs*, GAO-09-244R (Jan. 29, 2009), at 4-11,
    https://tinyurl.com/y2kgefp5.

17      [53] U.S. Border Patrol, *Mileage of Pedestrian and Vehicle Fencing by State* (Sept. 30,
18  2019), https://tinyurl.com/tkktspn.

        [54] *See, e.g.*, The WALL Act of 2019, S. 53, 116th Cong. (2019) (proposed $25 billion
19  appropriation for border wall; no action taken); The WALL Act of 2018, S. 3713, 115th Cong.
    (2018) (proposed $25 billion appropriation for border wall; no committee action); 50 Votes for
20  the Wall Act, H.R. 7073, 115th Cong. (2018) (proposed $25 billion appropriation for funding for
    border wall; no committee action); Build the Wall, Enforce the Law Act of 2018, H.R. 7059,
21  115th Cong. (2018) (proposed $16.6 billion appropriation for border wall; no committee action);
    Fund and Complete the Border Wall Act, H.R. 6657, 115th Cong. (2018) (proposed authorization
22  of funding for border wall; no committee action); American Border Act, H.R. 6415, 115th Cong.
    (2018) (proposed $16.6 billion appropriation for border wall; no committee action); Border
23  Security and Immigration Reform Act of 2018, H.R. 6136, 115th Cong. (2018) (proposed $16.6
    billion appropriation for border wall; voted down by House 301 to 121); Securing America's
24  Future Act of 2018, H.R. 4760, 115th Cong. (2018) (proposed construction of physical barrier,
25  including border wall; voted down by House 231 to 193); Border Security and Deferred Action
    Recipient Relief Act, S. 2199, 115th Cong. (2017) (proposal to make available $38.2 million for
26  planning for border wall construction; no action in Senate); Make America Secure Appropriations
    Act, H.R. 3219, 115th Cong. (2017) (proposed $38.2 million appropriation for border wall;
27  passed House of Representatives, but no action by Senate).

28

1   for the border wall.[55]

2   204.    On December 19, 2018, the Senate passed by voice vote a bill to fund the

3   government through February 8, 2019 that did not include any funding for a border wall.

4   Department of Defense Appropriations Act of 2018, H.R. 695, 115th Cong. (2018).

5   205.    After the Senate passed the temporary funding bill, on December 20, 2018,

6   President Trump announced that "I've made my position very clear.  Any measure that funds the

7   government must include border security," which he clarified must include funding for a wall.[56]

8   206.    On December 20, 2018, the House of Representatives approved a short-term

9   funding bill appropriating $5.7 billion for "U.S. Customs and Border Protection – Procurement,

10   Construction, and Improvements."  Department of Defense Appropriations Act of 2018, H.R.

11   695, 115th Cong. (2018).  The Senate never passed the House-approved version of the legislation.

12   207.    With no agreement between Congress and the President on funding, on December

13   22, 2018, the federal government partially shut down.

14   208.    On January 3, 2019, Nancy Pelosi became Speaker of the House.  The day before,

15   Speaker Pelosi reiterated in a televised interview that the House would be providing "[n]othing

16   for the wall."[57]  On January 3, the House of Representatives approved a short-term funding bill

17   without any funding for a border wall.  Consolidated Appropriations Act of 2019, H.R. 21, 116th

18   Cong. (2019).  The Senate never passed the House-approved version of the legislation.

19   209.    The Office of Management and Budget formally requested $5.7 billion from

20   Congress for the border wall on January 6, 2019.[58]

21   210.    On January 19, 2019, President Trump addressed the nation regarding the partial

22   government shutdown and laid out his immigration proposal.  In connection with his continued

23

24   [55] CSPAN, *President Trump Meeting with Democratic Leaders* (Dec. 11, 2018),
     https://tinyurl.com/ycalrz3x.

25   [56] CNN, *Trump: "I've Made My Position Very Clear" on Spending Bill* (Dec. 20, 2018),
     https://tinyurl.com/yy9cvzdd.

26   [57] Tal Axelrod, *Pelosi on Negotiations with Trump: "Nothing for the Wall,"* The Hill,
     (Jan. 2, 2019), https://tinyurl.com/y77o89hp.

27   [58] Letter from Russell T. Vought, Acting Director, Off. of Mgmt. and Budget, to Sen.
     Richard Shelby (Jan. 6, 2019), https://tinyurl.com/y224y59q.

28

1  proposal for $5.7 billion in funding for a wall, he said that "[a]s a candidate for president, I

2  promised I would fix this crisis, and I intend to keep that promise one way or the other."[59]

3     211.    When he announced the congressional agreement that ended the government

4  shutdown on January 25, 2019, President Trump stated: "If we don't get a fair deal from

5  Congress, the government will either shut down on February 15th, again, or I will use the powers

6  afforded to me under the laws and the Constitution of the United States to address this

7  emergency."[60]

8     212.    After weeks of negotiation, on February 14, 2019, Congress passed the

9  Consolidated Appropriations Act, 2019, which provided just $1.375 billion for border barrier

10  fencing.  Pub. L. No. 116-6, 133 Stat. 13, § 230(a)(1) ("FY 2019 Consolidated Appropriations

11  Act").  The FY 2019 Consolidated Appropriations Act also imposed limitations on the type of

12  fencing for which these funds could be used, specifying that the funds "shall only be available for

13  operationally effective designs deployed as of the date of the Consolidated Appropriations Act,

14  2017 (Public Law 115-31), such as currently deployed steel bollard designs, that prioritize agent

15  safety." *Id.* § 230(b).  On February 15, 2019, President Trump signed the FY 2019 Consolidated

16  Appropriations Act into law.

17     213.    As part of the President's FY 2020 budget, the President "request[ed] $5 billion to

18  construct approximately 200 miles of border wall along the U.S. Southwest border."[61]

19     214.    On December 19, 2019, Congress passed the Consolidated Appropriations Act,

20  2020, which provides just $1.375 billion "for the construction of barrier system along the

21  southwest border."  Pub L. No. 116-93, 133 Stat. 2317, § 209(a)(1) ("FY 2020 Consolidated

22  Appropriations Act").  The FY 2020 Consolidated Appropriations Act also imposes limitations

23  on the type of fencing that may be used for construction that include those that Congress imposed

24  in the FY 2019 Consolidated Appropriations Act, *id.* § 209(b)(1)(A), and adds that "operationally

[59] White House, *Remarks by President Trump on the Humanitarian Crisis on our Southern Border and the Shutdown* (Jan. 19, 2019), https://tinyurl.com/y7gdj6s8.
[60] White House, *Remarks by President Trump on the Government Shutdown* (Jan. 25, 2019), https://tinyurl.com/y4mplplb.
[61] White House, *A Budget for a Better America*, Fiscal Year 2020, Budget of the U.S. Government 50 (Mar. 11, 2019), https://tinyurl.com/y63rovly.

Complaint for Declaratory and Injunctive Relief

effective adaptations of such designs that help mitigate community or environmental impacts of barrier system construction, including adaptations based on consultation with jurisdictions within which barrier system will be constructed" may also be used. *Id.* § 209(b)(1)(B). On December 20, 2019, President Trump signed the FY 2020 Consolidated Appropriations Act into law.

215.    This $1.375 billion appropriation is the only funding in the FY 2020 Consolidated Appropriations Act that Congress designated for the construction of a border barrier.

216.    The FY 2019 and 2020 Consolidated Appropriations Acts also contain an appropriations rider limiting the transfer of federal funds appropriated by Congress for one purpose to augment a different program. That provision states:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, 133 Stat. at 197, § 739; Pub. L. No. 116-93, 133 Stat. at 2494, § 739.

217.    After signing the FY 2020 Consolidated Appropriations Act into law, the President has continued to seek money from Congress for a border wall. As part of the FY 2021 budget, the President has requested $2 billion from Congress "to construct approximately 82 miles of additional border wall along the U.S. Southwest border."[62]

III.    **PRESIDENT TRUMP'S EXECUTIVE ACTIONS AND EMERGENCY DECLARATION**

218.    On the same day that the President signed the FY 2019 Consolidated Appropriations Act into law, the Trump Administration announced that the President was taking executive action to redirect funding beyond what was appropriated by Congress toward construction of a border wall. The Administration outlined specific plans for the diversion of an additional $6.7 billion "that will be available to build the border wall once a national emergency is declared and additional funds have been reprogramed."[63] In its announcement of the 2019

---

[62] White House, *A Budget for America's Future, Fiscal Year 2021, Budget of the U.S. Government* (*FY 21 Budget*) 56 (Feb. 10, 2020), https://tinyurl.com/qnfcuu6.
[63] White House, *President Donald J. Trump's Border Security Victory* (Feb. 15, 2019), https://tinyurl.com/y3empmay.

Executive Action, the Administration identified the following funding for diversion to "be used sequentially":

- $601 million from the Treasury Forfeiture Fund;

- Up to $2.5 billion in DOD funds transferred for Support for Counterdrug Activities (10 U.S.C. § 284); and

- Up to $3.6 billion reallocated from DOD military construction projects under the President's declaration of a national emergency (10 U.S.C. § 2808).[64]

219.    In conjunction with that announcement, the President also declared a national emergency under the National Emergencies Act, claiming that there is a "border security and humanitarian crisis that threatens core national security interests and constitutes a national emergency."[65]  The Emergency Declaration claims that the border is an entry point for "criminals, gang members, and illicit narcotics."[66]  The Emergency Declaration continues: "The problem of large-scale unlawful migration through the southern border is long-standing, and despite the executive branch's exercise of existing statutory authorities, the situation has worsened in certain respects in recent years."[67]  It asserts that "recent years have seen sharp increases in the number of family units entering and seeking entry to the United States and an inability to provide detention space for many of these aliens while their removal proceedings are pending."[68]  The Emergency Declaration concludes that the difficulty in removing these family units justifies the declaration, but it does not make any connection to how the entry of these family units into the United States contributes to the flow of "criminals, gang members, and illicit narcotics" into the country.[69]

220.    The President invoked the National Emergencies Act and declared that the "emergency requires use of the Armed Forces" and "that the construction authority provided in

---

[64] Id.
[65] Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 15, 2019).
[66] Id.
[67] Id.
[68] Id.
[69] Id.

section 2808 of title 10, United States Code, is invoked and made available, according to its terms, to the Secretary of Defense, and at the discretion of the Secretary of Defense, to the Secretaries of the military departments."[70]

221.    The Emergency Declaration directs the Secretary of Defense or the Secretaries of relevant military departments to "order as many units or members of the Ready Reserve to active duty as the Secretary concerned, in the Secretary's discretion, determines to be appropriate to assist and support the activities of the Secretary of Homeland Security at the southern border."[71] The Emergency Declaration acknowledges that DOD had previously "provided support and resources to the Department of Homeland Security at the southern border" pursuant to President Trump's April 4, 2018 memorandum.[72]

222.    The Emergency Declaration further directs the Secretaries of Defense, Interior, and Homeland Security to "take all appropriate actions, consistent with applicable law, to use or support the use of the authorities herein invoked."[73]

223.    At a press conference announcing the 2019 Executive Action, President Trump acknowledged that Congress provided more than enough funding for homeland security, and that the Administration has "so much money, we don't know what to do with it."  In explaining his rationale for the 2019 Executive Action, the President candidly admitted that the Emergency Declaration reflected his personal preference to construct the wall more quickly, rather than an actual urgent need for it to be built immediately: "I could do the wall over a longer period of time. I didn't need to do this.  But I'd rather do it much faster."[74]

224.    Defendants implemented the 2019 Executive Action through two sets of diversions relevant here.  First, in March and May of 2019, DOD used its transfer authority provided in §§ 8005 and 9002 of the FY 2019 Department of Defense Appropriations Act, Pub. L. No. 115-245, 132 Stat. 2981, to divert $2.5 billion appropriated for other purposes into DOD's drug

---

[70] *Id.*
[71] *Id.* § 1.
[72] *Id.*
[73] *Id.* § 2.
[74] White House, *Remarks by President Trump on the National Security and Humanitarian Crisis on our Southern Border* (Feb. 15, 2019), https://tinyurl.com/y3jenqeu.

interdiction account for border wall construction, including in New Mexico and California, under 10 U.S.C. § 284.  *California*, ECF Nos. 173-1 at 1-8, 34-37 & 173-3 at 1-20.  Second, in September 2019, DOD announced that it was authorizing the diversion of $3.6 billion originally intended for military construction projects toward border barrier projects, including in New Mexico and California, under 10 U.S.C. § 2808.  *Id.*, ECF No. 206.  Out of that amount, DOD diverted $1.8 billion from 64 defunded domestic military construction projects, including 19 in the Plaintiff States.  *Id.*, ECF No. 207-1.

225.    On February 13, 2020, the President announced the continuation of the national emergency for one year.[75]

226.    Contemporaneous with that announcement, DOD used its transfer authority provided in §§ 8005 and 9002 of the FY 2020 Department of Defense Appropriations Act,[76] to divert $3.831 billion appropriated for other purposes into DOD's drug interdiction account for border wall construction, again including projects in New Mexico and California, under 10 U.S.C. § 284.  *California*, ECF No. 271 at 1-2.  These funds were originally to be used for procurement of various military equipment for the Army, Navy, Air Force, and the National Guard and Reserves.

227.    For example, Defendants' diversions include $790 million from an account used to provide the states' National Guards with vital equipment.  *Id.*, ECF No. 271-1, Ex. C at 5. Defendants' diversion also includes $100 million from an account for modernization of Humvee vehicles for the states' National Guards.  *Id.* at 2.

228.    A report based on DOD internal planning figures show that the DOD is planning to divert an additional $3.7 billion in military construction funding in FY 2020 in order to give the Trump Administration enough money to complete 885 miles of new fencing by the spring of 2022.[77]

---

[75] Continuation of the National Emergency Concerning the Southern Border of the United States, 85 Fed. Reg. 8715 (Feb. 13, 2020).

[76] The Department of Defense Appropriations Act, 2020 is Division A of the FY 2020 Consolidated Appropriations Act, Pub. L. No. 116-93, referred to throughout the complaint.

[77] Nick Miroff, *Trump planning to divert additional $7.2 billion in Pentagon funds for border wall*, Washington Post (Jan. 13, 2020), https://tinyurl.com/vy5o5qz.

229.    The Administration estimates that with "[f]unding made available from 2017 to 2020," $10.5 billion of which was not appropriated by Congress for border barriers, "the Administration will build up to approximately 1,000 miles of border wall along the Southwest border," and 400 miles will be built by the end of 2020.[78]

## IV.    LEGAL BACKGROUND

### A.    The National Emergencies Act (50 U.S.C. §§ 1601-1651)

230.    The National Emergencies Act ("NEA"), Pub. L. 94-412, 90 Stat. 1255, codified at 50 U.S.C. §§ 1601-1651, was enacted by Congress in 1976 to rein in, rather than expand, the power of the president.  The NEA was designed to "insure" that the President's "extraordinary" emergency powers would "be utilized only when emergencies actually exist."  S. Rep. No. 94-1168, at 2 (1976).  Senator Frank Church, who was instrumental in the development of the NEA, testified before the Senate Committee of Government Operations "that the President should not be allowed to invoke emergency authorities or in any way utilize the provisions of this Act for frivolous or partisan matters, nor for that matter in cases where important but not 'essential' problems are at stake."  Hearing on H.R. 3884 Before the S. Comm. of Governmental Operations, 94th Cong. 7 (1976) (statement of Sen. Frank Church).  Senator Church continued that "[t]he Committee intentionally chose language which would make clear that the authority of the Act was to be reserved for matters that are 'essential' to the protection of the Constitution and the people."  *Id.*

231.    The NEA allows the President to utilize emergency powers, as authorized by Congress in other federal statutes, when there is a national emergency, and one has been declared. 50 U.S.C. § 1621.

232.    Under the NEA, the President must specify the statutory emergency authorities he intends to invoke upon issuing a national emergency.  He must also publish the proclamation of a national emergency in the Federal Register and transmit it to Congress.  *Id.* § 1631.

233.    The NEA sets out a procedure whereby Congress may terminate the national emergency if a resolution is passed by both houses of Congress and becomes law.  *Id.* § 1622.

---

[78] *FY 2021 Budget* 6, 56, *supra* note 62.

This procedure requires that the joint resolution be signed into law by the President, or if vetoed by the President, that Congress overrides the veto with a two-thirds vote in both chambers of Congress. *Id.*

234.    On February 26, 2019, the House of Representatives passed H.J. Res. 46 terminating the Emergency Declaration by a vote of 245 to 182, which the Senate passed on March 14, 2019 by a vote of 59 to 41.  The President vetoed the joint resolution, and the House did not reach the necessary two-thirds majority to override the veto.

235.    On September 25, 2019, the Senate passed S.J. Res. 54 terminating the Emergency Declaration by a vote of 54 to 41, which the House passed on September 27, 2019 by a vote of 236 to 174.  The President again vetoed the joint resolution, and the Senate did not reach the necessary two-thirds majority to override the veto.

236.    As discussed above, the Emergency Declaration remains in place at this time.  *See supra*, para. 225.

**B.    Section 2808's Emergency Military Construction Authority (10 U.S.C. § 2808)**

237.    In FY 2019, DOD relied upon 10 U.S.C. § 2808 to reallocate $3.6 billion from military construction projects toward a border wall.  On information and belief, in FY 2020, Defendants will seek to use § 2808 to divert billions of additional funds toward a border wall.

238.    Section 2808 states that when the president declares a national emergency "that requires use of the armed forces," the Secretary of Defense may "undertake military construction projects . . . not otherwise authorized by law that are necessary to support such use of the armed forces."  10 U.S.C. § 2808(a).

239.    Section 2808 limits the funds available for emergency military construction to "the total amount of funds that have been appropriated for military construction . . . that have not been obligated."  *Id.*

240.    "Military construction" under Section 2808 includes "any construction, development, conversion, or extension of any kind carried out with respect to a military installation," and "military installation" includes a "base, camp, post, station, yard, center, or

47

1   other activity under the jurisdiction of the Secretary of a military department. . . ." 10 U.S.C. §

2   2801.

3       C.   **Section 284's Authority to Support Counter-Drug Activities (10 U.S.C.**
         **§ 284) and Transfer Authority under Sections 8005 and 9002**
4

5       241.    In FY 2019, Defendants sought to divert $2.5 billion from other DOD accounts

6   into the Department's account for counterdrug activities for border wall construction.  In FY 2020

7   Defendants have directed the transfer of over $3.8 billion more in federal funds, using a

8   combination of three provisions of law, none of which is dependent on the President declaring a

9   national emergency.

10      242.    First, 10 U.S.C. § 284 authorizes the Secretary of Defense to assist civilian law

11  enforcement with drug enforcement activities.  It states that the Secretary of Defense "may

12  provide support for the counterdrug activities or activities to counter transnational organized

13  crime" of any law enforcement agency.  10 U.S.C. § 284.  Such support may include

14  "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors

15  across international boundaries of the United States." *Id.*

16      243.    Second, § 8005 of the FY 2019 Department of Defense Appropriations Act and the

17  FY 2020 Department of Defense Appropriations Act provide that "[u]pon determination by the

18  Secretary of Defense that such action is necessary in the national interest, he may, with the

19  approval of the Office of Management and Budget, transfer not to exceed $4,000,000,000 of

20  working capital funds of the Department of Defense or funds made available in this Act to the

21  Department of Defense for military functions (except military construction) between such

22  appropriations or funds or any subdivision thereof, to be merged with and to be available for the

23  same purposes, and for the same time period, as the appropriation or fund to which transferred."

24  133 Stat. at 2335, § 8005; 132 Stat. at 2999, § 8005.

25      244.    Section 8005's transfer authority is subject to several conditions, including

26  "prompt" notification to Congress.  In addition, the § 8005 transfer authority "may not be used

27  unless for higher priority items, based on unforeseen military requirements, than those for which

28  originally appropriated and in no case where the item for which funds are requested has been

1    denied by Congress."  133 Stat. at 2335, § 8005; 132 Stat. at 2999, § 8005.

2        245.    Third, § 9002 of the FY 2019 and 2020 Department of Defense Appropriations

3    Acts also allows the transfer of funds between appropriations under certain circumstances, and "is

4    subject to the same terms and conditions as the authority provided in section 8005. . . ."  133 Stat.

5    at 2376, § 9002; 132 Stat. at 3042, § 9002.

6        246.    Defendants have not sufficiently explained how the diversion of DOD funds

7    toward construction of a border wall would "block drug smuggling corridors" as contemplated by

8    10 U.S.C. § 284.  Neither have Defendants sufficiently explained how transferring funding for a

9    border wall is for a "higher priority item."  Defendants also have not, and cannot, provide an

10   explanation sufficient to justify how diverting funds toward a border wall is for an "unforeseeable

11   military requirement," and *not* for a project for which Congress has denied funding.

12       **D.    National Environmental Policy Act (NEPA)**

13       247.    NEPA, 42 U.S.C. § 4321 *et seq.*, is the "basic national charter for protection of the

14   environment."  40 C.F.R. § 1500.l(a).  NEPA contains several action-forcing procedures, most

15   significantly the mandate to prepare an environmental impact statement (EIS) on major federal

16   actions "significantly affecting the quality of the human environment."  *Robertson v. Methow*

17   *Valley Citizens Council*, 490 U.S. 332, 348-49 (1989) (citing 42 U.S.C. § 4332(2)(C)).

18       248.    NEPA requires federal agencies to consider several factors relating to the

19   "intensity" of the project, including: the "[u]nique characteristics of the geographic area such as

20   proximity to . . . ecologically critical areas," 40 C.F.R. § 1508.27(b)(3); "[t]he degree to which

21   the action may adversely affect an endangered or threatened species or its habitat that has been

22   determined to be critical under the Endangered Species Act of 1973," *id.* § 1508.27(b)(9); and

23   "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed

24   for the protection of the environment," *id.* § 1508.27(b)(10).

25       249.    "NEPA requires that the evaluation of a project's environmental consequences

26   take place at an early stage in the project's planning process."  *State of Cal. v. Block*, 690 F.2d

27   753, 761 (9th Cir. 1982) (citation omitted).  A proposal subject to NEPA exists where an agency

28   has a goal and is actively preparing to make a decision on the alternatives in accomplishing that

49

goal, regardless of whether the agency declares that such a proposal exists: "An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal. . . ." 40 C.F.R. § 1502.5.  A "[p]roposal exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated." *Id.* § 1508.23.

**V.     THE FY 2020 DIVERSIONS ARE UNLAWFUL BECAUSE DEFENDANTS DO NOT SATISFY THE STATUTORY CRITERIA**

250.    Defendants' diversion of funding and resources for the proposed border wall does not satisfy the requirements of 10 U.S.C. § 284, the statutory provision authorizing support for counterdrug activities.  Section 284 is limited to authorizing DOD to provide "support" for the "[c]onstruction of roads and fences and installation of lighting," but that "support" does not authorize DOD to fully fund a construction project for DHS.  10 U.S.C. § 284(b)(7).  Section 284's structure further limits its scope, as it requires notice to Congress for "small scale construction" projects "not to exceed $750,000 for any project." *Id.* § 284(h), (i)(3).

251.    Moreover, the proposed border wall does not "block drug smuggling corridors," *id.* § 284(b)(7), as contemplated by the statute.  For years, the vast majority of the drugs smuggled into the country that the President has singled out as dangerous (methamphetamine, heroin, cocaine, and fentanyl)[79] have been smuggled through, not between, ports of entry.[80]

252.    From 2014-2019, 87 percent of cocaine, 88 percent of heroin, and 82 percent of methamphetamine seized by U.S. Customs and Border Protection ("CBP") came through ports of

---

[79] *Trump Address on Crisis at Border*, *supra* note 34; *see also* White House, *President Donald J. Trump Is Committed to Working with Congress to Solve Our Urgent Immigration Crisis* (Feb. 5, 2019), https://tinyurl.com/yyhzvrq9 ("Tens of thousands of Americans are killed by tons of deadly, illicit drugs trafficked into our country by criminal aliens, gangs, and cartels exploiting our porous border.  The lethal drugs that flood across our border and into our communities include meth, heroin, cocaine, and fentanyl.").

[80] *CBP Enforcement Statistics, supra* note 43 (showing that for FY 2019, out of all the drugs seized by CBP in that fiscal year, 88 percent of cocaine, 87 percent of heroin, 83 percent of methamphetamine, and 92 percent of fentanyl were seized by Field Operations at ports of entry).

50

1    entry.[81]

2          253.    From 2016-2019, 89 percent of fentanyl seized by CBP came through ports of

3    entry.[82]

4          254.    A 2018 Drug Enforcement Agency (DEA) National Drug Threat Assessment

5    affirms the CBP data showing that the bulk of dangerous illegal drugs flow through, not between,

6    ports of entry.[83]

7          255.    For example, in that report, the DEA states that "[a] small percentage of all heroin

8    seized by CBP along the land border was between Ports of Entry (POEs)."[84]

9          256.    As to fentanyl, the report states that "Mexican [Transnational Criminal

10   Organizations] most commonly smuggle the multi-kilogram loads of fentanyl concealed in

11   [privately owned vehicles] before trafficking the drugs through SWB POEs."[85]

12         257.    In a 2019 report, the DEA again acknowledges that "the most common method

13   employed [for drug smuggling] involves smuggling illicit drugs through U.S. POEs in passenger

14   vehicles with concealed compartments or commingled with legitimated goods on tractor-

15   trailers."[86]

16         258.    A 2019 Report by the U.S. Intelligence Community discusses drug trafficking

17   from Mexico; however, it contains no mention of smuggling between ports of entry.[87]  In fact,

18   this report notes that as to fentanyl—one of the drugs that President Trump has invoked in

19   support of the border wall[88]—"Chinese synthetic drug suppliers . . . probably ship the majority of

20   US fentanyl, when adjusted for purity."[89]

---

21         [81] *Id.*

22         [82] *Id.*

23         [83] DEA, *2018 National Drug Threat Assessment* (Oct. 2018),
     https://tinyurl.com/yaqyh3ld.

24         [84] *Id.*

25         [85] *Id.*
     [86] DEA, *2019 National Drug Threat Assessment* (Dec. 2019),
     https://tinyurl.com/yx25vkmt.

26         [87] Daniel R. Coats, *Worldwide Threat Assessment*, Off. of the Dir. of Nat'l Intelligence
     (Jan. 29, 2019), https://tinyurl.com/y9r6kkhu.

27         [88] *Trump Address on Crisis at Border*, *supra* note 42.

28         [89] *Worldwide Threat Assessment*, *supra* note 87 at 18; *see also California*, Brief of Former

259.    Defendants do not satisfy the criteria under §§ 8005 and 9002 of the FY 2020 Department of Defense Appropriations Act to transfer other DOD funds toward construction of the border wall because it is not a "higher priority item," is not an "unforeseen military requirement," and *is* an item for which Congress has denied funding.

260.    Defendants also do not satisfy the criteria of 10 U.S.C. § 2808.  The construction of a border wall also does not constitute a "military construction" project, as defined in 10 U.S.C. § 2801.  From at least 2001 until Defendants' 2019 diversion under § 2808, 10 U.S.C. § 2808 has only been invoked to justify military construction directly linked to a military installation.[90]  In fact, with one exception, it has only been invoked in relation to construction at military installations outside the United States.[91]  That single instance related to securing domestic sites at which weapons of mass destruction were sited.[92]

261.    Building a border wall does not "require[] use of the armed forces" under 10 U.S.C. § 2808.[93]  Construction of border fencing has been carried out by civilian contractors in recent years.  In fact, in 2007, the U.S. military informed DHS that "military personnel would no longer be available to build fencing."[94]  This, along with the desire to not take CBP agents away from their other duties, led CBP to decide to use "commercial labor for future infrastructure projects."[95]  This decision has been reflected in recent projects related to the border wall,

---

U.S. Gov't Officials as *Amici Curiae* in Supp. of Pls.' Mot. for Prelim. Inj. 6, ECF No. 139 ("Former Gov't Officials Amicus Brief") (noting that border wall will not "stop drugs from entering via international mail (which is how high-purity fentanyl, for example, is usually shipped from China directly to the United States)").

[90] Michael J. Vassalotti & Brendan W. McGarry, *Military Construction Funding in the Event of a National Emergency*, Cong. Res. Serv. (Jan. 11, 2019), https://tinyurl.com/y23t8xbc.
[91] *Id.*
[92] *Id.*
[93] *See also* Former Gov't Officials Amicus Brief, *supra* note 89, at 8 (noting that "the composition of southern border crossings has shifted such that families and unaccompanied minors now account for the majority of immigrants seeking entry at the southern border; these individuals do not present a threat that would need to be countered with military force").
[94] Gov't Accountability Office, *GAO-09-244R Secure Border Initiative Fence Construction Costs* 7 (Jan. 29, 2009), https://tinyurl.com/sjc5f8n.
[95] *Id.*

52

including contract awards in California[96] and Arizona[97] in Fall 2018.

262.    For the FY 2019 diversions, a federal court in the Northern District of California determined that the statutory provisions that Defendants invoke do not authorize the diversion of federal funds toward construction of a border wall.  That court found that Defendants did not satisfy the criteria under §§ 8005 and 9002 because border wall construction is not an "unforeseen military requirement" and is an item for which Congress has denied funding.  *California*, Order re: Pls.' Partial Mot. for Summ. J. 3-5, ECF No. 185.  Any contention that the need for the border wall is "unforeseeable" is even more absurd with respect to the FY 2020 diversion, since Defendants have attempted to use DOD resources toward the construction of the border wall since, at minimum, February 2019.  And the court found that Defendants did not satisfy the criteria under 10 U.S.C. § 2808 because the border wall is neither a "military construction project" nor "necessary to support the use of the armed forces."  *California*, Order re: Pls.' Partial Mot. for Summ. J. 22-33, ECF No. 257.  This same reasoning applies just as forcefully for the FY 2020 diversions at issue here.

## VI.    PLAINTIFF STATES AND THEIR RESIDENTS ARE HARMED BY THE EXECUTIVE ACTIONS

### A.    Harm caused by diversion of funding and other resources

263.    Plaintiff States and their residents are harmed by the Executive Actions and Defendants' unlawful actions undertaken to construct the border wall.  *See* Parties section *supra*.

264.    California will be harmed by Defendants' diversion of funds that Congress appropriated for DOD projects in the State, including, on information and belief, military construction projects.

265.    More funds are spent on defense in California than in any other state, with $49.0

---

[96] CBP, *Border Wall Contract Awards in California* (Dec. 21, 2018), https://tinyurl.com/y3px9ubj (announcing $287 million contract with SLSCO Ltd. to build border barriers).
[97] CBP, *Border Wall Contract Award in Arizona* (Nov. 15, 2018), https://tinyurl.com/y2t5u6pw (announcing $324 million contract with Barnard Construction Co. to build border barriers).

billion in FY 2017 and $57.7 billion in FY 2018.[98]

266.    California also leads the nation in defense contract spending, with $35.2 billion in FY 2017 and $42.5 billion in FY 2018.[99]  In FY 2017, Plaintiff States collectively accounted for $142.1 billion in defense contract spending, which represented over 52 percent of all defense contract spending.[100]  In FY 2018, Plaintiff States collectively accounted for $176.2 billion in defense contract spending, which represented over 49 percent of all defense contract spending.[101]

267.    For both FY 2017 and FY 2018, two of the top ten defense contract spending locations in the nation were in California (San Diego with $9.2 and $11.1 billion, and Los Angeles with $5.3 and $9.5 billion, respectively).[102]

268.    This defense spending—including construction—in California generates significant economic activity, employment, and tax revenue.[103]

269.    In FY 2016, defense spending generated $86.9 billion of direct economic activity in California, $17.4 billion of economic activity created through the supply chain, and $52 billion of "induced" economic activity created because of additional money in the economy.[104]  In FY 2018, this spending generated $95.3 billion of direct economic activity in California, $16.8 billion of economic activity created through the supply chain, and $55.2 billion of "induced" economic activity created because of additional money in the economy.[105]

270.    This economic activity, in turn, generates employment for Californians.  In FY

---

[98] *FY 2017 DOD Defense Spending by State*, *supra* note 2, at 6; FY 2018 DOD Spending by State Report, *supra* note 20, at 8

[99] *FY 2017 DOD Spending by State Report*, *supra* note 2, at 6; 2018 *FY DOD Spending by State Report*, *supra* note 20, at 8

[100] *FY 2017 DOD Spending by State Report*, *supra* note 2, at 6.

[101] *FY 2018 DOD Spending by State Report*, *supra* note 20, at 8.

[102] *FY 2017 DOD Spending by State Report*, *supra* note 2, at 13; *FY 2018 Spending by State Report*, *supra* note 20, at 17.

[103] Devin Lavelle, *California Statewide National Security Economic Impacts*, Cal. Res. Bureau, 5-9 (Aug. 2018), https://tinyurl.com/yxqlw43b (2018 California National Security Spending Impacts Report); Devin Lavelle, *California Statewide & Regional National Security Economic Impacts*, Cal. Res. Bureau, 4-7 (Dec. 2019), https://tinyurl.com/tn9vamz (2019 California National Security Spending Impacts Report).

[104] *2018 California National Security Spending Impacts Report*, *supra* note 103, at 5-6.

[105] *2019 California National Security Spending Impacts Report*, *supra* note 103, at 4.

---

2016, approximately 358,000 jobs were directly attributable to employment by defense agencies and their contractors, 84,000 were generated through the supply chain, and 324,000 resulted from economic activity induced by the additional money in the economy.[106]  In FY 2018, approximately 393,000 jobs were directly attributable to employment by defense agencies and their contractors, 80,000 were generated through the supply chain, and 322,000 resulted from economic activity induced by the additional money in the economy.[107]

271.   In FY 2016, the economic activity generated by defense spending also resulted in significant tax revenues for California at the state and local level, estimated at $5.8 billion total annually, including $1.9 billion in income tax, $1.7 billion in sales tax and $1.3 billion in property tax.[108]  In FY 2017, the economic activity generated by defense spending also resulted in significant tax revenues for California at the state and local level, estimated at $7.2 billion total annually, including $2.2 billion in income tax, $1.8 billion in sales tax and $1.7 billion in property tax.[109]

272.   A number of military construction projects for which funds have been appropriated but are as yet unobligated are planned in California, and are threatened by Defendants' planned diversions.[110]  On information and belief, Defendants' diversion of funds for the border wall threatens over $4 billion in funding for military construction projects currently planned in California.  *Id.* at 22, 43.

273.   These projects include repairs to existing military infrastructure, as well as projects of massive economic significance, such as an over $2.3 billion project at Naval Air Weapons Station China Lake.  *Id.* at 102.  Other projects meet the basic safety and welfare needs of service members, such as wastewater treatment, *id.* at 132, and child care, *id.* at 102.

---

[106] *2018 California National Security Spending Impacts Report*, *supra* note 103, at 6.
[107] *2019 California National Security Spending Impacts Report*, *supra* note 103, at 4.
[108] *2018 California National Security Spending Impacts Report*, *supra* note 103, at 7.
[109] *2019 California National Security Spending Impacts Report*, *supra* note 103, at 5.
[110] *E.g.*, DOD, *Construction Programs (C-1), Department of Defense Budget Fiscal Year 2021* (Feb. 2020), https://tinyurl.com/yx3fvmhl.
[111] Adam Stone, *Added Help with Equipment*, National Guard Magazine (Apr. 24, 2018), https://tinyurl.com/r5ye4cf (quoting H. Rep. Comm. on Approps. report) (internal punctuation omitted).

274. If Defendants determine that these projects can wait, funding for them could be diverted to the border wall, and California would be deprived of the resulting positive economic, employment, and tax consequences.

275. On information and belief, California's National Guard also stands to suffer from the lost opportunity to procure vital military equipment from the National Guard and Reserve Equipment Account ("NGREA").  DOD's reprogramming action seeks to divert $790 from NGREA toward the construction of a border wall.  *California*, ECF No. 271-1, Ex. C. at 5.

276. NGREA has been a critical source of funding for National Guard units nationwide since 1981, when Congress first created the account due to the "tremendous shortage of equipment available to the Guard and Reserve."[111]  Indeed, the most recent DOD report relating to NGREA shows that the Army National Guard had a $14 billion equipment shortage, and the Air National Guard had an over $5.3 billion shortage.[112]

277. The states' National Guard units fulfill dual purposes; not only are they part of the federal reserve force to support the active duty military, they serve as state assets to provide critical support to civil authorities, including in response to natural disasters such as wildfires, winter storms, floods, hurricanes, and tornadoes.  For example, in FY 2018, the Army National Guard units provided engineer support to California for debris removal following wildfires.[113]  As DOD states, "[i]n order to be ready and available to respond to domestic emergencies, it is key the [Army National Guard units] receive the most modern and available equipment."[114]

278. California's Army and Air National Guards have historically submitted requests for tens of millions of dollars' worth of essential dual equipment from NGREA per year.  The equipment that California receives from NGREA is dual-purpose, allowing California's National Guard to both provide public safety support to civil authorities in times of emergency such as natural disasters, and to provide mission-ready forces to the federal government.

---

[111] Adam Stone, *Added Help with Equipment*, National Guard Magazine (Apr. 24, 2018), https://tinyurl.com/r5ye4cf (quoting H. Rep. Comm. on Approps. report) (internal punctuation omitted).
[112] DOD, Off. of the Asst. Sec. for Defense for Readiness, *National Guard and Reserve Equipment Report for Fiscal Year 2020* (Mar. 2019) 1-18 to 1-19, https://tinyurl.com/rk5wqdj.
[113] *Id.* at 2-26.
[114] *Id.*

279.    California's National Guard has received equipment from this account in the past for critical domestic uses, including equipping C-130 planes for use in fighting wildfires and sensors on Lakota helicopters for use in locating people lost in the wilderness.

280.    For FY 2020, California requested approximately $50 million worth of such dual-use equipment.  For instance, the California Air National Guard has requested $7 million for equipment to enhance airborne firefighting capabilities to better respond to and contain destructive wildfires in the State.  Defendants' $790 million diversion from NGREA diminishes the opportunity for California to obtain such equipment for its National Guard units to meet its vital public safety purposes.

281.    Likewise, on information and belief, Defendants' diversions of $100 million from an account for modernization of Humvees for the states' National Guards, *California*, ECF No. 271-1, Ex. C at 2, harms California.  California's National Guard uses Humvees for both military and civil emergency purposes.  As DOD itself states, "modernization of the HMMWV Cargo fleet . . . will enable the ARNG to sustain the [Humvee] fleet in the interim as a critical . . . transportation asset during domestic operations."[115]

282.    As demonstrated above in paragraphs 25 through 179, other Plaintiff States will suffer similar harms due to Defendants' diversions.

**B.    Environmental harms to the States of California and New Mexico**

283.    As part of their February 13, 2020 announcement, DOD announced that diverted funds would be used in thirteen project areas, including six in California and New Mexico.  *California*, ECF No. 271.  In California, Defendants plan to use funds to build 3 miles of new primary pedestrian fencing and 14 miles of replacement pedestrian fencing in the San Diego Sector in the San Diego County and 10 miles of new pedestrian fencing in the El Centro Sector in Imperial County.  *Id.* at 2.  In New Mexico, Defendants plan to use funds toward construction in the El Paso Sector consisting of 2 miles of new pedestrian fencing in Luna County, 10 miles of replacement fencing in Luna and Dona Ana Counties, and 0.5 miles of new primary pedestrian fencing in Dona Ana County.  *Id.* at 3.  Defendants have identified precise coordinates for this

[115] *Id.* at 2-14.

1    construction.  *Id.*, ECF No. 271-1 at 8, 10, 11, 17-18.

2         284.    CBP's San Diego Sector is located in San Diego County, California and

3    shares a 60-mile segment of the border with Mexico, at least 46 linear miles of which are already

4    lined with primary fencing.[116]  The only portions of the border located within the San Diego

5    Sector that are not already lined with primary fencing are located in the southeastern portion of

6    the county in or near the Otay Mountain Wilderness Area.[117]  Thus, the only segment of the

7    border within the San Diego Sector where DHS can construct new primary fencing are areas

8    within or near the Otay Wilderness Area.

9         285.    CBP's El Centro Sector is located within Imperial County, California, and shares a

10   70-mile segment of the border with Mexico, at least 59 linear miles of which are already lined by

11   primary fencing.[118]  The only portions of the border located within the El Centro Sector that are

12   not already lined with primary fencing are located in the southwestern portion of Imperial

13   County, which is comprised of a mountainous landscape and the Jacumba Wilderness Area.[119]

14   Thus, the only segment of the border within the El Centro Sector where DHS can construct new

15   primary fencing are areas within or near the Jacumba Wilderness Area.

16        286.    The Otay Mountain Wilderness and the Jacumba Wilderness areas are home to

17   more than 100 sensitive plant and animal species that are listed as "endangered," "threatened," or

18   "rare" under the federal Endangered Species Act of 1973, 16 U.S.C. §§ 1531-44, and/or the

19   California Endangered Species Act, Cal. Fish & Game Code §§ 2050-89.25.  These species

20   include the following federally and state endangered species: the Mexican flannel bush,

21
          [116] Gov't Accountability Off., *GAO-17-331, Southwest Border Security: Additional*
22   *Actions Needed to Better Assess Fencing's Contributions to Operations and Provide Guidance*
     *for Identifying Capability Gaps* 48 (Feb. 2017), https://tinyurl.com/yaqbny6e (Southwest Border
23   Security).
          [117] CBP, *Border Fencing – California* (June 2011), https://tinyurl.com/y24zbfb4 (Border
24   Fencing 2011); Business Insider, *As the government shutdown over Trump's border wall rages, a*
     *journey along the entire 1,933-mile US-Mexico border shows the monumental task of securing it*
25   (Jan. 12, 2019), https://tinyurl.com/vfbykgg (Business Insider Border Wall Map).
          [118] CBP, *El Centro Sector California* (Apr. 11, 2018), https://tinyurl.com/y5kpbk2e;
26   *Southwest Border Security*, *supra* note 116.
          [119] CBP, *Border Fencing 2011*, *supra* note 117; *Business Insider Border Wall Map*, *supra*
27   note 117.

28

Thornmint, the Quino Checkerspot Butterfly, the Southwestern Willow Flycatcher bird, and the Peninsular Desert Bighorn sheep.[120]  Some of the listed plant species, such as the Tecate Cypress and the Mexican flannel bush, are so rare they can only be found in these wilderness areas.[121] The federally and state-endangered Peninsular Desert Bighorn sheep has a range that includes mountainous terrain in Mexico near the United States-Mexico border and extends north across the border through the Jacumba Wilderness to California's Anza-Borrego State Park.[122]

287.    The construction of border barriers within or near the Jacumba Wilderness Area and the Otay Mountain Wilderness Area will have significant adverse effects on environmental resources, including direct and indirect impacts to endangered or threatened wildlife.  These injuries to California's public trust resources would not occur but for Defendants' unlawful and unconstitutional diversion of funds.

288.    Defendants' use of diverted funds to construct a border wall in New Mexico will impose environmental harm to the State.  The environmental damage caused by a border wall in New Mexico would include the blocking of wildlife migration, flooding, and habitat loss.[123]

289.    The construction of a border wall in the El Paso Sector along New Mexico's southern border will have significant adverse effects on the State's environmental resources, including direct and indirect impacts to endangered or threatened wildlife.

290.    The Chihuahuan desert bisected by the New Mexico-Mexico border is the most

---

[120] Cal. Dept. of Fish & Wildlife, *State and Federally Listed Endangered and Threatened Animals in California*, 2, 10, 13 (Aug. 7, 2019), https://tinyurl.com/jkwndf3; Cal. Dept. of Fish & Wildlife, *State and Federally Listed Endangered, Threatened, and Rare Plants of California*, 1, 7 (Jan. 2, 2020), https://tinyurl.com/rb592yn; U.S. Bureau of Land Management, *Jacumba Wilderness*, https://tinyurl.com/y43hv424 (last visited Feb. 27, 2020) (showing location of Jacumba Wilderness on map); U.S. Bureau of Land Management, *Otay Mountain Wilderness*, https://tinyurl.com/y3zamvsh (last visited Feb. 27, 2020) (showing location of Otay Mountain Wilderness on map); Wilderness Connect, *Otay Mountain Wilderness*, https://tinyurl.com/rm6cwvc (last visited Feb. 27, 2020).

[121] *Otay Mountain*, *supra* note 120.

[122] Cal. Dept. of Fish & Wildlife, *Peninsular Desert Bighorn Sheep* https://tinyurl.com/yyvu5kwa (last visited Feb. 27, 2020).

[123] *See* Robert Peters et al., *Nature Divided, Scientists United: US–Mexico Border Wall Threatens Biodiversity and Binational Conservation*, BioScience, 740-42 (Oct. 2018), https://tinyurl.com/y3t4ymfn.

biologically diverse desert in the Western Hemisphere.[124]  The "bootheel" region of New Mexico includes the Peloncillo and Sierra San Luis Mountains and contains an extremely high diversity of plant and animal species, and also includes critical habitat for the endangered jaguar, as designated under the Endangered Species Act.  Species common along the border are a number of endangered, threatened, and candidate species including the beautiful shiner, Chiricahua leopard frog, jaguar, lesser long-nosed bat, loach minnow, Mexican long-nosed bat, Mexican spotted owl, Mexican wolf, narrow-headed gartersnake, New Mexican ridge-nosed rattle snake, northern aplomado falcon, northern Mexican gartersnake, southwestern willow flycatcher, spikedace, and yellow billed cuckoo.[125]  A barrier built in the Chihuahuan desert is likely to disrupt or destroy habitat of these migratory animals, nesting birds and reclusive reptiles.

291.    In particular, New Mexico's border is also home to the endangered Mexican wolf, the rarest subspecies of gray wolf in North America, which was nearly extirpated by the 1970s and only recently reintroduced.[126]  An impenetrable wall may make it impossible for the wolf to disperse across the border to reestablish recently extirpated populations or bolster small existing populations.  On March 14, 2018, the New Mexico Department of Game and Fish signed an agreement with the U.S. Department of Fish and Wildlife to increase cooperation in reintroduction of this species to the wild, evidencing the State's commitment to preventing the extinction of this species.[127]

292.    The segment of New Mexico's border with Mexico that does not already have substantial primary fencing is in the State's "bootheel" region.[128]  Defendants intend to use the

---

[124] Nat'l Park Service, *Chihuahuan Desert Ecoregion* (Sept. 20, 2018), https://www.nps.gov/im/chdn/ecoregion.htm.
[125] U.S. Fish & Wildlife Serv., *Species by County Report*, https://tinyurl.com/yxmwz9qm (Hidalgo County, NM), https://tinyurl.com/y4ojwrtq (Luna County, NM) (last visited Feb. 27, 2020).
[126] U.S. Fish & Wildlife Serv., *Mexican Wolf*, https://tinyurl.com/y2hf5ea2 (last updated Nov. 1, 2019).
[127] U.S. Fish and Wildlife Serv., *Partners in Mexican Wolf Recovery Once Again, New Mexico Department of Game & Fish Official Signs on to Help Manage Mexican Wolves* (Nov. 13, 2019), https://tinyurl.com/wkop4kh.
[128] *Border Fencing 2011*, *supra* note 117, at 5.

diverted funding to construct barriers in New Mexico's bootheel, which will cause environmental harm in one of the State's most ecologically pristine and fragile regions.  The bootheel is where temperate and subtropical climates converge, making it another of the most biologically diverse regions in the world, home to jaguars and wolves that coexist along the U.S.-Mexico border.[129] Recognizing the ecological importance of this region, the U.S. Fish and Wildlife Service has designated large segments of the bootheel's border with Mexico as critical habitat for the jaguar.[130]

293.     Defendant DHS has not engaged in a public review of these adverse effects.  By failing to do so at the earliest possible stage of the project's planning process, DHS is violating the requirements of NEPA.  *Robertson*, 490 U.S. at 348-49 (1989); 40 C.F.R. §§ 1508.27(b)(9), (10).  Because of these actions, California and New Mexico have suffered, and will continue to suffer, injuries to their procedural rights under NEPA and the APA, 5 U.S.C.§ 551, and injuries to their concrete, quasi-sovereign interests relating to the preservation of wildlife resources within their boundaries, including but not limited to wildlife on state properties.  *Massachusetts v. EPA*, 549 U.S. 497, 519-24 (2007); *Sierra Forest Legacy*, 646 F.3d at 1178.  These injuries to California's and New Mexico's procedural rights and quasi-sovereign interests would not occur but for Defendants' unlawful and unconstitutional diversion of funds.

## DECLARATORY AND INJUNCTIVE RELIEF

294.     Plaintiff States will suffer irreparable injury if Defendants take action to build the border wall by diverting funds and resources in contravention of the United States Constitution and several federal statutes, and Plaintiffs have no adequate remedy at law.

---

[129] USGS, *Jaguar Surveying and Monitoring in the United States (Ver. 1.1)*, 4 (Nov. 2016) https://tinyurl.com/seeyphb; New Mexico Game and Fish, *Wildlife Notes*, https://tinyurl.com/zc8gzx3 (last visited Feb. 27, 2020); Kenneth Boykin, *Spatial Identification of Statewide Areas for Conservation Focus in New Mexico: Implications for State Conservation Efforts* (2011) https://tinyurl.com/sk8wwuo (last visited Feb. 27, 2020).

[130] U.S. Fish & Wildlife Serv., *Jaguar (Panthera onca)*, https://tinyurl.com/y6qpjdjl; 79 Fed. Reg. 12571 (Mar. 5, 2014).

## **FIRST CLAIM FOR RELIEF**

### **VIOLATION OF CONSTITUTIONAL SEPARATION OF POWERS**

### **(Including Presentment Clause)**

295.    Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

296.    Article I, Section 1 of the United States Constitution enumerates that "[a]ll legislative Powers herein granted shall be vested in [the] Congress."  Article I, Section 8, Clause 1 of the United States Constitution vests exclusively in Congress the spending power to "provide for the . . . general Welfare of the United States."

297.    Article I, Section 7, Clause 2 of the United States Constitution, known as the Presentment Clause, requires that all bills passed by the House of Representatives and the Senate be presented to the President for signature.  The President then has the choice to sign or veto the bill.  Article II, Section 3 of the United States Constitution requires that the President "shall take Care that the Laws be faithfully executed."

298.    The President acts at the lowest ebb of his power if he acts contrary to the expressed or implied will of Congress.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  Moreover, there is no provision in the United States Constitution "that authorizes the President to enact, amend, or repeal statutes," including appropriations already approved by Congress and signed into law by the President.  *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

299.    Defendants have violated the United States Constitution's separation of powers doctrine—including the Presentment Clause—by unilaterally taking executive action to fund a border wall for which Congress has refused to appropriate funding.

300.    For the reasons stated herein, Plaintiffs are entitled to a declaration that Defendants' diversion of funding and resources toward the construction of a border wall is unconstitutional, and the Court should enjoin Defendants' implementation of the President's Executive Actions.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF APPROPRIATIONS CLAUSE**

301.     Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

302.     Article I, Section 9, Clause 7, known as the Appropriations Clause, provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." The Appropriations Clause is a "straightforward and explicit command" that "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

303.     Section 1301 of title 31 of the United States Code, known as the "Purpose Statute," provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). This statutory provision "reinforce[s] Congress's control over appropriated funds," *Dep't of the Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012), and "codified what was already required under the Appropriations Clause of the Constitution," Gov't Accountability Off., Off. of the Gen'l Counsel, Principles of Federal Appropriations Law 3-10 (4th Ed. 2017).

304.     For FY 2020, Congress did not authorize or appropriate the funding that Defendants have diverted towards the construction of a border wall. Defendants have therefore violated the Appropriations Clause by funding construction of the border wall with funds that were not appropriated for that purpose.

305.     Defendants have also violated the Appropriations Clause by seeking to use a general appropriation to circumvent the specific limitations that Congress imposed on border barrier funding in the FY 2020 Consolidated Appropriations Act. *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005).

306.     For the reasons stated herein, Plaintiffs are entitled to a declaration that Defendants' diversion of funding and resources for FY 2020 toward the construction of a border wall is unconstitutional, and the Court should enjoin Defendants' implementation of the

63

1  President's Executive Actions.

2  **THIRD CLAIM FOR RELIEF**

3  **ULTRA VIRES**

4  307.    Plaintiff States incorporate the allegations of the preceding paragraphs by

5  reference.

6  308.    Neither the President nor an agency can take any action that exceeds the scope of

7  their constitutional and/or statutory authority.

8  309.    Defendants have acted ultra vires in seeking to divert funds and resources under 10

9  U.S.C. § 284 because they fail to meet the criteria required under that statute.  The statute does

10  not contemplate the construction of a multi-billion dollar border wall as proposed by the

11  President.  *Cf.* 10 U.S.C. §§ 284(h), (i)(3) (requiring congressional notification of small-scale

12  projects).  Further, the proposed border wall would not block "drug smuggling corridors" as

13  required under 10 U.S.C. § 284(b)(7).

14  310.    Defendants have acted ultra vires in seeking to divert funds under §§ 8005 and

15  9002 of the FY 2020 Department of Defense Appropriations Act for the construction of a border

16  wall because the funds are not being transferred for: (a) a "higher priority item[];" (b) "unforeseen

17  military requirements;" or (c) an item for which Congress has not denied funding.

18  311.    Defendants have acted ultra vires in seeking to divert funds under 10 U.S.C.

19  § 2808 for failure to meet the criteria required under that statute.  The construction of the border

20  wall: (a) is not a "military construction project[];" (b) does not "require[] use of the armed

21  forces;" and (c) is not "necessary to support such use of the armed forces."

22  312.    Defendants have acted ultra vires by seeking to divert funds in violation of the

23  prohibition in § 739 of the FY 2020 Consolidated Appropriations Act, because the diversions

24  increase funding for the border wall proposed in the President's budget, other than through an

25  appropriation enacted in an appropriation act or validly through a reprogramming or transfer

26  provision in an appropriations act.

27  313.    For the reasons stated herein, Plaintiffs are entitled to a declaration that

28  Defendants' diversion of funding and resources for FY 2020 toward the construction of a border

64

wall is unlawful, and the Court should enjoin Defendants' implementation of the President's Executive Actions.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (Constitutional Violation and Excess of Statutory Authority)

314.    Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

315.    Defendant DOD is an "agency" under the APA, 5 U.S.C. § 551(1), and diversions of funding for construction of a border wall constitute "agency action" under the APA, *id.* § 551(13).

316.    The diversion of federal funds toward construction of a border wall constitutes an agency action which is reviewable under the APA.  *Id.* § 704.

317.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  *Id.* § 706(2)(B)-(C).

318.    Defendant DOD's diversion of funds and resources under 10 U.S.C. § 284 and §§ 8005 and 9002 of the FY 2020 Department of Defense Appropriations Act is unconstitutional because Defendants have: (a) overstepped their powers by acting contrary to the implied and express will of Congress; (b) modified appropriations that have already been approved by Congress in repudiation of the clear policy judgments made by Congress; and (c) diverted funds and resources for the construction of a border wall that Congress did not appropriate for that purpose.  Furthermore, DOD's diversion of federal funds and resources under those statutes for construction of a border wall is ultra vires in excess of its statutory authority and in violation of the prohibition contained in § 739 of the FY 2020 Consolidated Appropriations Act.

319.    For the reasons stated herein, because Defendant DOD acted unconstitutionally and in excess of its statutory authority in diverting federal funds and resources toward

65

1    construction of a border wall pursuant to the statutes described above, these actions are unlawful

2    and should be set aside under 5 U.S.C. § 706.  Moreover, the Court should enjoin Defendants'

3    implementation of the Executive Actions.

4                                **FIFTH CLAIM FOR RELIEF**

5                        **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**
                                  **(Arbitrary and Capricious)**
6

7            320.    Plaintiff States incorporate the allegations of the preceding paragraphs by

8    reference.

9            321.    Defendant DOD is an "agency" under the APA, 5 U.S.C. § 551(1), and its actions

10   to divert funding for construction of a border wall constitute "agency action" under the APA, *id.*

11   § 551(13).

12           322.    The diversion of federal funds toward construction of a border wall constitutes an

13   agency action which is reviewable under the APA.  *Id.* § 704.

14           323.    The APA requires that a court "hold unlawful and set aside agency action,

15   findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

16   otherwise not in accordance with law."  *Id.* § 706(2)(A).

17           324.    Defendant DOD's diversion of funds and resources under 10 U.S.C. § 284 and

18   §§ 8005 and 9002 of the FY 2020 Department of Defense Appropriations Act for construction of

19   a border wall is arbitrary and capricious and an abuse of discretion because DOD has relied on

20   factors that Congress did not intend it to consider, failed to consider an important aspect of the

21   problem the agency is addressing, and failed to offer a satisfactory explanation for the decision to

22   divert funding and resources toward construction of a border wall that is consistent with the

23   evidence that is before the agencies.  *See Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm*

24   *Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

25           325.    For example, Congress repeatedly denied the Administration's requested funding

26   for a border wall, implicitly rejecting the reasoning behind Defendants' diversions and the factors

27   they relied on to reach that decision.

28

326.    Further, there is no indication that DOD considered the harm that the diversions and construction will cause to the States' sovereignty, fiscs, and environment when it took these actions, ignoring important aspects of the problem.

327.    Finally, DOD's invocation of 10 U.S.C. § 284 as justification for its diversion and construction is inconsistent with the evidence before the agency.  As discussed above, the vast majority of the dangerous illegal drugs that Defendants point to as justifying construction of border barriers is not smuggled across the southwest land border between ports of entry, but enters the United States by other means.  Thus, the planned border wall will not serve to block drug-smuggling corridors.

328.    For the reasons stated herein, because Defendant DOD acted in an arbitrary and capricious manner in diverting federal funds and resources toward construction of a border wall pursuant to the statutes described above, these actions are unlawful and should be set aside under 5 U.S.C. § 706.  Moreover, the Court should enjoin Defendants' implementation of the Executive Actions.

## SIXTH CLAIM FOR RELIEF

### VIOLATION OF NATIONAL ENVIRONMENTAL POLICY ACT

### (For Plaintiff States California and New Mexico)

329.    Plaintiff States incorporate the allegations of the preceding paragraphs by reference.

330.    Defendant DHS is an "agency" under the APA, 5 U.S.C. § 552(1).

331.    Defendant DHS has taken final agency action by proposing southern border wall development projects in "high priority" areas and identifying specific projects along the border in the El Centro, San Diego, and El Paso Sectors.[131]

332.    Defendants, through the Executive Actions, have taken steps to divert federal

---

[131] DHS has not issued waivers of environmental laws such as NEPA for the proposed FY 2020 projects.  (DHS has issued such waivers pursuant to section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act, 8 U.S.C. § 1103 note, for previous border barrier projects.  84 Fed. Reg. 2897 (Feb. 8, 2019); 83 Fed. Reg. 3012 (Jan. 22, 2018); 82 Fed. Reg. 42829 (Sept. 12, 2017); 82 Fed. Reg. 35984 (Aug. 2, 2017)).

1    funds and other resources for those southern border wall construction projects.

2         333.    NEPA compels federal agencies such as Defendant DHS to evaluate and consider

3    the direct, indirect and cumulative effects that a proposed development project or program will

4    have on the environment by requiring the agency to prepare an EIS that analyzes a reasonable

5    range of alternatives and compares each alternative's environmental impacts.  40 C.F.R. §§

6    1502.16, 1508.7, 1508.8, l508.27(b)(7).  The EIS must also include an analysis of the affected

7    areas and resources and the environmental consequences of the proposed action and the

8    alternatives.  *Id.* §§ 1502.10-.19.  The agency must commence preparation of the EIS "as close as

9    possible to the time the agency is developing or is presented with a proposal" so that the

10   environmental effects of each alternative can be evaluated in a meaningful way.  *Id.* § 1502.5.

11        334.    Defendant DHS is in violation of NEPA and the APA because it failed to prepare

12   an EIS concerning border wall development projects that will have adverse effects on the

13   environment, including but not limited to direct, indirect and cumulative impacts on plant and

14   animal species that are listed as endangered or threatened under the federal Endangered Species

15   Act and/or California Endangered Species Act.

16        335.    The imminent nature of this action is shown by the Trump Administration's

17   expressed intent to use diverted funds to build "approximately 400 miles of new border wall" on

18   the southern border by the end of 2020.[132]  Further, Defendants have announced their intent to

19   modify existing contracts to begin construction on FY 2020 projects as early as March 15, 2020,

20   and to initiate new contracts as early as April 7, 2020.  *California*, ECF No. 271-2 ¶ 5.

21   Defendants acknowledge that "ground-disturbing activities . . . may occur as early as the dates of

22   the execution of the contract modification," or five days after the award of a new contract.  *Id.*

23        336.    The States of California and New Mexico have concrete and particularized

24   sovereign interests in the protection of natural, historical, cultural, economic, and recreational

25   resources within their jurisdictional boundaries.  Defendants' failure to comply with NEPA and

26   the APA injures and denies California's and New Mexico's procedural rights necessary to protect

27   these interests.

28   _____
        [132] *FY 2021 Budget, supra* note 62, at 6.

68

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff States respectfully request that this Court enter judgment in their favor, and grant the following relief:

1.     Issue a judicial declaration that the Executive Actions' diversion of federal funds and resources toward construction of a border wall is unconstitutional and/or unlawful because it: (a) violates the separation of powers doctrine; (b) violates the Presentment Clause; (c) violates the Appropriations Clause; (d) exceeds congressional authority conferred to the Executive Branch and is ultra vires; and (e) violates the APA;

2.     For the States of California and New Mexico, issue a judicial declaration that Defendants violated the NEPA and APA;

3.     Permanently enjoin Defendants from constructing a border wall without an appropriation by Congress for that purpose;

4.     Permanently enjoin Defendants from diverting federal funding and resources toward construction of a border wall;

5.     For the States of California and New Mexico, permanently enjoin DHS, requiring it to comply with the NEPA and APA—including preparing an EIS—before taking any further action pursuant to the Executive Actions; and

6.     Grant such other relief as the Court may deem just and proper.

Dated: March 3, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ROBERT W. BYRNE
MICHAEL L. NEWMAN
Senior Assistant Attorneys General
MICHAEL P. CAYABAN
CHRISTINE CHUANG
EDWARD H. OCHOA
Supervising Deputy Attorneys General

*/s/ Lee I. Sherman*
LEE I. SHERMAN (SBN 272271)
BRIAN J. BILFORD
SPARSH S. KHANDESHI
HEATHER C. LESLIE
LEE I. SHERMAN
JANELLE M. SMITH
JAMES F. ZAHRADKA II
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013
  Telephone: (213) 269-6404
  E-mail: Lee.Sherman@doj.ca.gov
*Attorneys for Plaintiff State of California*

PHILIP J. WEISER
Attorney General of Colorado

WILLIAM TONG
Attorney General of Connecticut

*/s/ Eric. R. Olson*
ERIC R. OLSON (*pro hac vice forthcoming*)
Solicitor General
Colorado Department of Law
Office of the Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6500
Eric.olson@coag.gov
*Attorneys for Plaintiff State of Colorado*

*/s/ Margaret Q. Chapple*
MARGARET Q. CHAPPLE (*pro hac vice forthcoming*)
Deputy Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5316
Margaret.chapple@ct.gov
*Attorneys for Plaintiff State of Connecticut*

70

CLARE E. CONNORS
Attorney General of Hawaii

*/s/ Robert T. Nakatuji*
ROBERT T. NAKATUJI (*pro hac vice forthcoming*)
First Deputy Solicitor General
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1360
Robert.T.Nakatsuji@hawaii.gov
*Attorneys for Plaintiff State of Hawaii*


BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN
Solicitor General

*/s/ Jeffrey P. Dunlap*
JEFFREY P. DUNLAP (*pro hac vice forthcoming*)
Assistant Attorney General
200 Saint Paul Place
Baltimore, MD 21202
Telephone: (410) 576-7906
jdunlap@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*


MAURA HEALEY
Attorney General for Massachusetts

*/s/ Abigail B. Taylor*
ABIGAIL B. TAYLOR (*pro hac vice forthcoming*)
Chief, Civil Rights Division
DAVID C. KRAVITZ
Assistant State Solicitor
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Telephone: (617) 727-2200
Abigail.Taylor@mass.gov
David.Kravitz@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*


KWAME RAOUL
Attorney General
State of Illinois

*/s/ Elizabeth Roberson-Young*
ELIZABETH ROBERSON-YOUNG, Public Interest Counsel (*pro hac vice forthcoming*)
JEFFREY VANDAM, Public Interest Counsel
100 West Randolph Street, 12th Floor
Chicago, IL 60601
Telephone: (312) 814-5028
erobersonyoung@atg.state.il.us
*Attorneys for Plaintiff State of Illinois*


AARON M. FREY
Attorney General of Maine

*/s/ Susan P. Herman*
SUSAN P. HERMAN (*pro hac vice pending*)
Deputy Attorney General
6 State House Station
Augusta, ME 04333-0006
Telephone: (207) 626-8814
susan.herman@maine.gov
*Attorneys for Plaintiff State of Maine*


DANA NESSEL
Michigan Attorney General

*/s/ B. Eric Restuccia*
B. ERIC RESUCCIA (P49550) (*pro hac vice pending*)
Assistant Attorney General
Solicitor General Fadwa A. Hammoud
P.O. Box 30212
Lansing, Michigan 48909
*Attorneys for Plaintiff State of Michigan*

71

KEITH ELLISON
Attorney General of Minnesota
JOHN KELLER
Chief Deputy Attorney General
JAMES W. CANADAY
Deputy Attorney General

*/s/ Jacob Campion*
JACOB CAMPION *(pro hac vice forthcoming)*
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
Telephone: (651) 757-1459
Email: jacob.campion@ag.state.rnn.us
*Attorneys for Plaintiff State of Minnesota*

GURBIR S. GREWAL
Attorney General of New Jersey

*/s/ Jeremy Feigenbaum*
JEREMY FEIGENBAUM *(pro hac vice forthcoming)*
Assistant Attorney General
MARIE SOUEID
Deputy Attorney General
New Jersey Attorney General's Office
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
Telephone: (609) 376-3235
Jeremy.Feigenbaum@njoag.gov
*Attorneys for Plaintiff State of New Jersey*

AARON D. FORD
Attorney General of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN *(pro hac vice forthcoming)*
Solicitor General
Office of the Nevada Attorney General
100 North Carson Street
Carson City, NV 89701-4717
Telephone: (775) 684-1100
*Attorneys for Plaintiff State of Nevada*

HECTOR BALDERAS
Attorney General of New Mexico

*/s/ Tainia Maestas*
TANIA MAESTAS *(pro hac vice forthcoming)*
Chief Deputy Attorney General
NICHOLAS M. SYDOW
Civil Appellate Chief
JENNIE LUSK
Civil Rights Bureau Chief
MATTHEW L. GARCIA
Governor's General Counsel
PO Drawer 1508
Santa Fe, NM 87504-1508
tmaestas@nmag.gov
*Attorneys for Plaintiff State of New Mexico,*
*by and through Attorney General Hector Balderas*

72

| | |
|---|---|
| LETITIA JAMES | ELLEN ROSENBLUM |
| Attorney General of the State of New York | Attorney General of Oregon |

By: /s/ *Matthew Colangelo*  
Matthew Colangelo  
  *Chief Counsel for Federal Initiatives*  
Steven C. Wu, *Deputy Solicitor General*  
Eric R. Haren, *Special Counsel*  
Gavin McCabe, *Special Assistant Attorney General*  
Amanda Meyer, *Assistant Attorney General*  
Office of the New York State Attorney General  
28 Liberty Street  
New York, NY 10005  
Telephone: (212) 416-6057  
matthew.colangelo@ag.ny.gov  
*Attorneys for the State of New York*

*/s/ J. Nicole DeFever*  
J. NICOLE DEFEVER SBN #191525  
Senior Assistant Attorney General  
Oregon Department of Justice  
Telephone: (971) 673-1880  
Nicole.DeFever@doj.state.or.us  
*Attorneys for the State of Oregon*

| | |
|---|---|
| PETER F. NERONHA | THOMAS J. DONOVAN |
| Attorney General of Rhode Island | Attorney General of Vermont |

*/s/ Justin J. Sullivan*  
JUSTIN J. SULLIVAN (*pro hac vice forthcoming*)  
Special Assistant Attorney General  
Rhode Island Office of the Attorney General  
150 South Main Street  
Providence, RI 02903  
Telephone: (401) 274-4400  
jjsullivan@riag.ri.gov  
*Attorneys for Plaintiff State of Rhode Island*

*/s/ Benjamin D. Battles*  
BENJAMIN D. BATTLES (*pro hac vice forthcoming*)  
Solicitor General  
109 State Street  
Montpelier, VT 05609  
Telephone: (802) 828-5500  
benjamin.battles@vermont.gov  
*Attorneys for the State of Vermont*

Complaint for Declaratory and Injunctive Relief

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MARK R. HERRING
Attorney General
TOBY J. HEYENS
  Solicitor General
    Counsel of Record
MICHELLE S. KALLEN
MARTINE E. CICCONI
  Deputy Solicitors General
JESSICA MERRY SAMUELS
  Assistant Solicitor General

*/s/ Zachary R. Glubiak*
ZACHARY R. GLUBIAK (*pro hac vice*
*forthcoming*)
  Attorney
Office of the Attorney General
202 North Ninth Street
Richmond, VA 23219
Telephone: (804) 786-7240
solicitorgeneral@oag.state.va.us
*Attorneys for Plaintiff Commonwealth of*
*Virginia*

JOSHUA L. KAUL
Wisconsin Attorney General

*/s/ Gabe Johnson-Karp*
GABE JOHNSON-KARP (*pro hac vice*
*forthcoming*)
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707
Telephone: (608) 267-8904
johnsonkarpg@doj.state.wi.us
*Attorney for State of Wisconsin*

74

Complaint for Declaratory and Injunctive Relief

1

## ATTESTATION OF SIGNATURES

2   I, Lee I. Sherman, hereby attest, pursuant to Local Civil Rule 5-1(i)(3) of the Northern

3 District of California that concurrence in the filing of this document has been obtained from each

4 signatory hereto.

5

6             */s/ Lee I. Sherman*

7             Lee I. Sherman
              Deputy Attorney General
8             *Attorney for Plaintiff*
              *State of California*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief